DETROIT, G. H. & M. RY. CO. v. POWERS, Auditor General.

(Circuit Court, W. D. Michigan, S. D. May 19, 1905.)

TAXATION OF RAILROADS—CONTRACT IN CHARTER—VALIDITY.

In 1834 the territorial council of the territory of Michigan by special act chartered the Detroit & Pontiac Railroad Company. By Act No. 140, p. 305, Laws 1855, the Legislature of the state authorized such company to change its name to the Detroit & Milwaukee Railway Company, and to purchase the property and franchises of another company, and extend its line, which were done. Such act also provided that the company should pay to the state annually a tax of 1 per cent. on its capital stock, which should be in lieu of all other taxes. Act No. 96, p. 252, of 1859, provided that on the sale of the road of any railroad company in foreclosure proceedings the company might be reorganized under any name chosen by the purchasers, and continue under the original charter. Through foreclosure sales under such act, said company was twice reorganized, the last time under the name of complainant, the Detroit, Grand Haven & Milwaukee Railway Company. Subsequently, in an action brought by the state, the Supreme Court, in a decision binding on the federal courts, held that the acts of 1855 and 1859 were both within the powers of the Legislature under the state Constitution of 1850, and that neither the act of 1855 nor the reorganizations after foreclosure created a new corporation, but that the old one was continued. *Held*, that the provision of the act of 1855, with respect to taxation, created a contract between the state and the company, which remained in force, notwithstanding its reorganization and change of name and the subsequent action of the Legislature in passing an act purporting to repeal the same and the original charter, and that the ad valorem taxation of complainant's property under Act No. 173, p. 236, Acts 1901, was illegal, and the collection of the tax would be enjoined.

In Equity. Suit to enjoin collection of taxes.

In this case, in addition to the facts stated in the opinion in the Michigan Railroad Tax Cases (just decided) 138 Fed. 223, it appears that the charter of the Detroit & Pontiac Railroad Company was granted by the territorial council of the territory of Michigan on March 7, 1834, under which a railroad company was organized, and a railroad built from Detroit to Pontiac, and put in operation in the fall of 1844. By act of April 3, 1848 (Laws 1848, p. 351, No. 234), a charter was granted by the Legislature of the state of Michigan to the Oakland & Ottawa Railroad Company for the construction of a railroad from Pontiac by way of Fentonville to Lake Michigan, under which a line was located and construction of the road begun. The Legislature of Michigan, by an act approved February 13, 1855 (Laws 1855, p. 305, No. 140) authorized the Detroit & Pontiac Railroad to change its name to Detroit & Milwaukee Railway Company, and to purchase all the rights, property, and franchises of the Oakland & Ottawa Railroad Company for the purpose of building and operating a continuous line of road from Detroit to Lake Michigan by way of Pontiac and Fentonville, which was done. This act provided (page 307, § 9) that: "The said company shall, on or before the first day of July, pay the state treasurer an annual tax of one per cent. on the capital stock of said company paid in, which tax shall be in lieu of all other taxes, except for penalties imposed upon said company by its act of incorporation or any other law of this state;" and it was also provided (page

306, § 7) that said company might issue its corporate bonds or obligations for such sums as it might borrow, and might "secure the same by a mortgage of the road or other property of said company." Since 1850, the Michigan Constitution (article 15, § 1) has provided that: "Corporations may be formed under general laws but shall not be created by special act except for municipal purposes. All laws passed pursuant to this section may be amended, altered or repealed." And section 8 of the same article has since that time provided that: "The Legislature shall pass no law altering or amending any act of incorporation heretofore granted without the assent of two-thirds of the members elected to each house; nor shall any such act be renewed or extended." In 1860 certain mortgages on the road, given to secure the repayment of money borrowed in 1855, were foreclosed, and the company reorganized as the Detroit & Milwaukee Railway Company; and again, in 1878, the road, with its appurtenances and franchises, was sold upon mortgage foreclosure, and again reorganized as the Detroit, Grand Haven & Milwaukee Railway Company. These foreclosures and reorganizations both took place pursuant to Act No. 96, p. 252, of 1859, which provided (section 1): "That upon the foreclosure of any mortgage or pledge of the property and franchises of any railroad corporation, if the railway track and its appurtenances are sold at the sale thereunder, and if the purchaser or purchasers shall, either by purchase from said company or otherwise, provide suitable equipments for running said road, and performing in all respects the duties to the public by law incumbent upon said corporation, and shall transfer to said corporation again its railway track and appurtenances, and all and singular the equipments necessary to run the same, and perform all its duties to the public, and shall, under their hands and seals, and verified by their oaths, declare that he or they, having become such purchaser or purchasers, are desirous of continuing to perform the duties and enjoying the franchises and immunities of said corporation, and state in said declaration, under oath, that they have so provided the means for continuing the same, and set forth the name which he or they desire said corporation to be thereafter called, and shall file said declaration with the Secretary of State, together with a copy of the order confirming the sale to him or them, and notify the Attorney General, then such purchaser or purchasers shall be at liberty to issue, and themselves hold, new stock in said corporation to such an amount and of such denomination as they shall deem proper: provided, that unless additional stock shall be in good faith subscribed by persons able fully to pay up the same, new stock to a greater amount shall not be issued than sufficient at par to represent the fair value of all the property and rights then owned by said corporation. When said new stock shall be issued, and the holders thereof shall proceed as they are hereby authorized to do, to elect officers for said corporation, and said officers shall duly qualify for the same, as by the charter required, the old officers of said company shall be superseded, and the old stock in said corporation shall be deemed forfeited, and may be cancelled on the books of said corporation, and the new stockholders and officers shall, in the law, be deemed, and taken to be the stockholders and officers of said corporation, the charter and all laws appertaining thereto continuing to be the charter and laws regulating and governing said corporation, except that it may be known and called, and sue and be sued, and may contract, and do all acts which in the law it could have done in its old name, in and by the name set forth in the declaration aforesaid. And the said corporation shall not be liable for any debts or obligations except those by it thereafter contracted. But no prior mortgage or lien shall be in any way affected by such proceeding, and all property whatsoever, if any, that shall not be sold, shall remain liable for all the debts of such corporation, and no liability of any corporator, director or other person whatsoever, shall be in anywise lessened or affected by any proceeding or act authorized by this act." In 1891 (Pub. Acts 1891, p. 144, No. 123, § 49) the Michigan Legislature added a section to the railroad law, as follows: "Every railroad and railway company operating a railroad in whole or in part in this state which company may have been by means of a consolidation under any general or special law of this state, or by means of a mortgage foreclosure and sale and reorganization, under

any general law of this state, is hereby declared to be in all respects subject to the general laws of the state respecting railroads as now existing or as hereafter amended; and any franchise, right, power, privilege, immunity or exemption claimed by any such railroad or railway company of a kind which would not belong to a company organized under the general railroad laws of the state as now existing or as hereafter amended is hereby annulled and abrogated, and every such company shall be subject to all the restrictions and perform all the duties now imposed by the general laws or which may hereafter be imposed upon railroad companies." And in 1900 (Ex. Sess. Laws 1900, p. 10, No. 5) the Legislature passed an act providing: "That an act of the territorial legislative council of Michigan, of eighteen hundred thirty-four, entitled 'An act to incorporate the Detroit & Pontiac Railroad Company,' approved March seventh, eighteen hundred and thirty-four, and act number one hundred forty of the Session Laws of eighteen hundred fifty-five, entitled 'An act to authorize the consolidation of the Detroit & Pontiac and the Oakland & Ottawa Railroad Companies, so as to form a continuous line from Detroit to Lake Michigan, under the name of the Detroit & Milwaukee Railway Company,' and all acts amendatory or supplementary thereto, the same constituting the special charter under which the Detroit & Milwaukee Railway Company, now known as the Detroit, Grand Haven & Milwaukee Railway Company, was created, be and the same are hereby repealed, said repeal to take effect, and be in force from and after the thirty-first day of December, nineteen hundred one." The complainants, since 1898, have paid taxes pursuant to the general railroad law of the state, but have always duly protected themselves by a written protest against the exaction.

E. W. Meddaugh and Harrison Geer (L. C. Stanley, of counsel), for complainant.

Charles A. Blair (Roger Irving Wykes, of counsel), for defendant.

WANTY, District Judge, after making the foregoing statement, delivered the opinion of the court.

Besides urging all the grounds stated by the complainants in the Michigan Railroad Tax Cases, it is contended that by its charter a contract existed between the complainant and the state of Michigan, whereby the complainant should pay 1 per cent. on its capital stock in lieu of all other taxes, the impairment of which contract by the provisions of Act No. 173, p. 236, Acts 1901, is beyond the power of the state. That the provision in the act of 1855 for the payment of an annual tax of 1 per cent. of its capital stock in lieu of all other taxes constituted a contract between the state and the railroad company seems clear; but the defendant says that this provision was made by the Legislature after the Constitution provided that every such act might be amended, altered, or repealed, and therefore it presented no obstruction to the passage of Act No. 173. If that provision of the Constitution applied to the act of 1855, containing this provision, the right to alter, amend, or repeal it cannot be questioned, and each succeeding Legislature would have that power. The design of the provisions of the Constitution above quoted was evidently to prevent the creation of any more corporations in the state of Michigan by special acts, as had theretofore been done, and to prevent the altering or amending of any special act of incorporation theretofore granted without the assent of two-thirds of the members of the Legislature elected to each house, and to prevent

any such act from being renewed or extended. The provision in regard to amendment, alteration, or repeal applied only to corporations thereafter to be formed under the general laws of the state, and no corporations could thereafter be formed except under such general laws; but it had no reference to the corporations which had been theretofore formed under special acts. The only restrictions as to such corporations were that no change could be made in their special charters except by a vote of two-thirds of the members of the Legislature elected to each house, and the renewal or extension of those charters was prohibited absolutely. The Legislature could not create a new corporation, and give it any right or immunity which could not be taken away by a subsequent Legislature; but it does not follow that a subsequent Legislature could impair the obligation of a contract between the state and a corporation formed before the adoption of this clause in the Constitution, when the contract was made with all the formalities provided in the Constitution itself.

It is contended that under section 1 of article 15 the reserved right to alter, amend, or repeal acts of incorporation was designed to keep under control the corporate rights, privileges, and immunities, whether contained in an act of incorporation, an amending act, or an independent statute, and to prevent the Legislature from granting irrepealable exemptions and privileges to corporations existing previous to as well as after the reservation was placed in the Constitution. If that had been the intention of the people in adopting the Constitution, they would have used apt words, and provided that the Legislature should pass no law enlarging the powers of any act of incorporation theretofore granted; but instead the people adopted sections 1 and 8, above quoted, which provide that thereafter no corporation may be formed by special act except for municipal purposes, and that laws passed pursuant to that section may be amended, altered, or repealed; and in section 8 they provide that no law altering or amending any act of incorporation theretofore granted can be passed without the assent of two-thirds of the members elected to each house of the Legislature, and that no such act shall be renewed or extended. It seems clear that it was intended by the Constitution to provide for the enlargement of the powers of corporations already existing by a two-thirds vote of each house of the Legislature, and the Supreme Court of Michigan has held that by the act of 1855 no new corporation was formed, but the Detroit & Pontiac Railroad Company was continued under a new name. Attorney General v. Joy, 55 Mich. 94, 20 N. W. 806. The case of Northern Central Ry. Co. v. Maryland, 187 U. S. 258, 23 Sup. Ct. 62, 47 L. Ed. 167, upon which the defendant relies in claiming that section 1 of article 15 applies to the complainant, is not authority in this case, because the act of 1854 referred to in that opinion created a new corporation, while the Constitution of Maryland of 1850, then in force, provided that all corporations formed under general laws or special acts might be altered from time to time or repealed. The vital difference is that the case of Northern Central Ry. Co. v. Maryland, and all similar cases referred to by coun-

sel for the defendant, deals with corporations organized after the adoption of the Constitution providing that the laws under which they are created may be altered, amended, or repealed, while in this case the corporation was formed by a special act before the constitutional provision was adopted; and the amendment made in 1854 does not create a new corporation, and therefore the clause of the Constitution providing for the amendment, alteration, and repeal does not apply.

The defendant contends that previous to the enactment of the statute of 1891, above quoted, by which the Legislature endeavored to bring the complainant under the general railroad law of the state, and the enactment of 1900, by which the Legislature attempted to repeal the charter of the Detroit & Pontiac Railroad Company, and the statute of 1855, authorizing the consolidation of the Detroit & Pontiac and Oakland & Ottawa Railroad Companies, and all of the acts amendatory and supplementary thereto, the complainant became a new corporation through the two foreclosures of mortgages and reorganizations under the act of 1859, already referred to; and therefore became subject in all respects to legislative control, because the new corporation would have no vested right in the tax limitation claimed by the complainant which the Legislature under the alter, amend, or repeal clause of the Constitution could not control. To show that the necessary and inevitable result of the foreclosure and reorganization under Act No. 96, p. 252, of 1859, is that the existence of the Detroit & Pontiac Railroad Company did not vest and continue in the corporation upon reorganization, and that new corporations, whose existence date from reorganizations, and whose rights and powers are measured by laws then in force, resulted, many authorities are cited, which it would be interesting to review were it not for the fact that the whole matter has been disposed of by the Supreme Court of Michigan in the case of Attorney General v. Joy, 55 Mich. 94, 20 N. W. 806, which holds that the purpose of the statute of 1855 was to enable the Detroit & Pontiac Railroad Company to take a new name, and that the Legislature had the constitutional power to pass the act of February 10, 1859, above quoted; and its effect was not to allow the creation of new corporations, but to permit the creditors of chartered corporations to enforce their demands by a sale and transfer of the franchises, and to provide a method whereby those franchises might be kept alive. That decision, construing the Constitution and statute of the state, is binding upon this court. In that case the Attorney General filed an information against the directors of the complainant in this case, charging them with usurping corporate rights, and claiming to be organized and incorporated under acts of the territory of Michigan and the state of Michigan, before referred to. The defendants set up the charter of the Detroit & Pontiac Railroad Company and the charter of the Oakland & Ottawa Railroad Company, before referred to, and the act of the Legislature of February 13, 1855, and the mortgage and sales of the road and subsequent reorganization under the statute of 1859, whereby complainants became possessed of all the franchises and privileges of the Detroit

& Pontiac Railroad Company under the act of March 7, 1834 (Laws 1834–36, p. 40), and the act of February 13, 1855, hereinbefore referred to. In deciding the case Judge Cooley uses this language, which may have some significance regarding the consideration of the contract made by the act of 1855:

"The act of 1855 was not promoted exclusively in the interest of the railroad companies named in it, but the state itself was largely concerned, and expected to accomplish important public purposes by means of it. Twenty years before that time the state had planned for the construction of several parallel lines of railroad across the state from east to west, one of which was to be north of the line of the Michigan Central Railroad, and was expected to be of very high value, not only to all that part of the state through which it would run, but to the whole state. Much disappointment had come from the road not being constructed; and when the Detroit & Pontiac Railroad Company, which already had near thirty miles of road in successful operation, and could command means for the construction of more, proposed, on certain terms, which were expressed in the act of 1855, to purchase the rights and franchises of the Oakland & Ottawa Company, and to extend their own road to Lake Michigan, there is no reason for doubting that the people of the state at large looked upon this as a favorable opportunity for accomplishing a desire which twenty years before had found expression in the legislation of the state, and which ever since had been kept constantly in view."

In another part of the opinion he says:

"It has already been seen that the important public purpose which the state had in view in assenting to the act of 1855 has been accomplished. The railroad from Pontiac to Lake Michigan has been constructed, and for many years operated, and the state has reaped the benefits. But in order to accomplish this public purpose it seems to have become necessary to put the bonds and shares of the Detroit & Milwaukee Railway Company upon the market as well in Europe as in this country. The state recognized the necessity, and by its legislation provided for facilitating sales. The bonds and shares were sold to the amount of very many millions, and every purchaser of one of them made the purchase in reliance upon legislation of this state which appeared to sanction, if not to invite it."

And further in the opinion the court says:

"But another objection is made to the act of 1855, which goes to its substance. The act, it is said, is in conflict with that provision of the Constitution which declares that the Legislature shall pass no act renewing or extending a special act of incorporation. (Article 15, § 8.) The act of 1855, it is said, undertook to do this; and, as the Legislature could not do it originally, neither could it afterwards confirm and validate the void attempt. We think the relator misconceives the act. It does not purport or attempt to renew or extend any special act of incorporation. The general purpose is to enable the Detroit & Pontiac Railroad Company to take a new name, and under such new name to extend its road from Pontiac to Lake Michigan. There was nothing in this opposed to the Constitution either in letter or spirit. And this answers a further objection that the act of 1855 created a new corporation in violation of article 15, § 1, of the Constitution. We do not so understand it."

In regard to the reorganization under the act of February 10, 1859, it is said:

"It is further contended that an act approved February 10, 1859, under which the railroad company is supposed to have been reorganized after the sales on foreclosure, was without validity for that purpose for the two reasons: First, that it was without validity when passed; and, second, that it has since, by implication, been repealed. The act is entitled 'An act in relation to mortgages against preferred stock in, and the delivery of goods.

by, railway companies.' Here it is said are two or more objects expressed, and therefore the act is invalid under the Constitution, art. 4, § 20. This is a somewhat technical objection, and we are not disposed to consider it after this great lapse of time. But it may be proper to remark that the act did not bring together subjects totally foreign to each other. The whole act concerned railways; and if it can be considered a technical disregard of the Constitution, it was probably inadvertent. The repeal of the act is supposed to have been accomplished either by the amendment of the general railroad law by an act passed in 1872 (Sess Laws, p. 83), or by the general revision of that law in 1873 (Pub. Acts, p. 496, No. 198), both of which covered the same general subject. But we do not agree in this. Those acts must be understood to refer to companies organized under the general railroad law, while the act of 1859 evidently had other companies in view. It speaks of railway companies—a term not made use of in the general law, but which the company succeeding the Detroit & Pontiac had taken as a part of its new name. It is suggested, rather than urged, that the Legislature had no constitutional power to pass the act of February 10, 1859, as applicable to chartered corporations, because the effect was to create new corporations with the old chartered powers. But the purpose of the act was to permit the creditors of chartered corporations to enforce their demands by a sale and transfer of the franchises; and this would be impossible if the sale were of itself to operate as a destruction of the franchises. The act merely gave a remedy for the enforcement of debts: and, as franchises were to be sold for the satisfaction of debts, it provided a method whereby they might be kept alive. We have now considered the questions raised, so far as seems necessary to a determination of the main question whether the defendants are guilty of the usurpation charged upon them, and are clearly of the opinion that they are not. It may be proper to refer to the case of Cook v. Detroit, Grand Haven & Milwaukee Railway Co., 43 Mich. 349, 5 N. W. 390, in which the validity of that corporation was indirectly recognized, though importance is not attached to it except as a part of the public history of the company."

The reasoning contained in the brief of the defendant and the numerous cases cited might have been very convincing before the judgment in the case of Attorney General v. Joy was rendered, but, whatever conclusion we might have come to if we were allowed to exercise an independent judgment is forestalled by that decision of the Michigan Supreme Court, and we therefore hold that the complainant is a corporation organized under the territorial act of 1834 as the Detroit & Pontiac Railroad Company, and that the act of 1855, giving it the tax limitation of 1 per cent. on its capital stock, is binding on the state, and may not be impaired by Act No. 173, p. 236, of 1901, and a permanent injunction should issue as prayed.