PEOPLE, *ex rel.* ATTORNEY GENERAL, *v.* DETROIT, GRAND
HAVEN & MILWAUKEE RAILWAY CO.

PEOPLE *v.* SAME.

1. JUDGMENTS—CONCLUSIVENESS—CONSTITUTIONAL LAW.

> The validity of the charter of the Detroit, Grand Haven &
> Milwaukee Railway Company is foreclosed by *Cook* v. *Rail-
> way Co.*, 43 Mich. 349; *Attorney General* v. *Joy*, 55 Mich. 94;
> and *Powers* v. *Railway Co.*, 201 U. S. 543; and may not
> be questioned in quo warranto proceedings or by a bill in
> equity to collect taxes levied in disregard of the special
> charter.

2. SAME.

> All questions of law which might or should have been raised
> in the complainant's favor upon the prior proceeding are con-
> cluded in a subsequent cause based on the same claims.

3. SAME—PARTIES—PUBLIC OFFICERS.

> The State is concluded by judgments in proceedings to which
> its attorney general and auditor general were parties, under
> 1 Comp. Laws, § 105, providing that the attorney general
> shall represent the several State departments in the prosecu-
> tion and defense of suits relating thereto, and under Act 173,
> Pub. Acts 1901, § 13, authorizing the auditor general to en-
> force tax liens by an appropriate action.

Appeal from Ingham; Wiest, J.   Submitted March 2,
1909.   (Docket No. 144.)   Decided June 7, 1909.

Bill by the people of the State of Michigan against the
Detroit, Grand Haven & Milwaukee Railway Company
and others for the collection of certain taxes.   From a
decree dismissing the bill, complainant appeals.   Af-
firmed.

Quo warranto proceedings by the people of the State of
Michigan, on the relation of John E. Bird, attorney gen-
eral, to determine the validity of the franchise of the De-

troit, Grand Haven & Milwaukee Railway Company. Submitted March 2, 1909.    (Docket No. 143.)    Order of dismissal entered June 7, 1909.

*John E. Bird,* Attorney General (*Timothy E. Tarsney, De Vere Hall,* and *Roger I. Wykes,* of counsel), for complainant and petitioner.

*H. Geer* and *L. C. Stanley,* for defendants and respondent.

GRANT, J.    By these two suits the State of Michigan, through its legal department, for the third time attacks in the courts the validity of the special charter under which the respondent was organized, and under which it has conducted its business for more than half a century. The first suit was brought in the circuit court for the county of Ingham to collect taxes assessed against the respondent under section 49, Act No. 123, and Act No. 133, Pub. Acts 1891, which sought to place all railroads, whether organized under a general or a special law or by means of mortgage foreclosure and sale and reorganization, upon an *ad valorem* basis of taxation.    The second suit, quo warranto, is brought in this court for the purpose of declaring the special charter of the respondent void, and to bring it under the general taxation law of the State.    In the former suit the learned circuit judge sustained the validity of defendant's charter, and dismissed the bill.    The issue is the same in both cases.    In this opinion we shall therefore treat them as one case.

The history of the respondent's organization, the authorized issue of bonds by it, the foreclosures of its several mortgages, the sales thereunder, the purchases and transfers by the purchasers to the respondent are sufficiently set forth in *Cook* v. *Railway Co.,* 43 Mich. 349 (5 N. W. 390); *Attorney General* v. *Joy,* 55 Mich. 94 (20 N. W. 806); *Detroit, etc., R. Co.* v. *Powers,* 138 Fed. 264; *Powers* v. *Railway Co.,* 201 U. S. 543 (26 Sup. Ct.

556). We deem it unnecessary to restate here in detail this history. The acceptance of the charter made a contract with the State, by which the company agreed to pay annually a tax of 1 per cent. on its capital stock, to be in lieu of all other taxes. The Constitution of 1850 recognized the existence and validity of corporations existing by special charter, for it provided that—

"The legislature shall pass no law altering or amending any act of incorporation heretofore granted, without the assent of two-thirds of the members elected to each house; nor shall any such act be renewed." Section 8, art. 15.

The legislature recognized the existence of respondent's special charter by Act No. 5, Laws Ex. Sess. 1900, by which it was provided:

"That an act of the territorial legislative council of Michigan, of eighteen hundred thirty-four, entitled 'An act to incorporate the Detroit & Pontiac Railroad Company,' approved March seventh, eighteen hundred and thirty-four, and act number one hundred forty of the session laws of eighteen hundred and fifty-five, entitled 'An act to authorize the consolidation of the Detroit & Pontiac and the Oakland & Ottawa Railroad Companies, so as to form a continuous line from Detroit to Lake Michigan, under the name of the Detroit & Milwaukee Railway Company,' and all acts amendatory or supplementary thereto, the same constituting the special charter under which the Detroit & Milwaukee Railway Company, now known as the Detroit, Grand Haven & Milwaukee Railroad Company, was created, be and the same are hereby repealed, said repeal to take effect, and be in force from and after the thirty-first day of December, nineteen hundred one."

Have the former decisions of this court and of the Federal courts adjudicated the issue now presented so that the question is *res judicata* ? If this question be answered in the affirmative, it forecloses discussion and determination of the reasons now urged again in behalf of the State against the validity of respondent's charter. In *Cook* v. *Railway Co.*, *supra*, the validity of defendant's charter was not attacked. Its existence, however, was

distinctly recognized, as is held in the other cases above cited. That case distinctly held that the physical property of the corporation and also its franchise, to wit, its right to do business under the original charter, passed by the foreclosure sale. The law provided for its sale for that purpose. Obviously its physical property without its franchise would have been of little value to a purchaser. It was sold and purchased with a view to a continuation of its business. As was said in that case:

"A sale to a purchaser who could not exercise the corporate privileges could have been of no use."

Its mortgages covered its franchise, and the sale conveyed the franchise. It was no new franchise, but the old one continued. In the other cases the validity of the charter was vigorously and directly attacked for various reasons. In *Attorney General* v. *Joy, supra*, the opinion charged the respondent "with claiming and usurping the corporate right, liberty, privilege and franchise known and called the Detroit, Grand Haven & Milwaukee Railway Company." Able and well-known counsel were employed, both on behalf of the State and the respondents. Presumably counsel for the State attacked the validity of the charter from every direction they conceived attack possible. If, however (and this is wholly improbable), the learned counsel for the State failed to produce some argument or raise some point which they might have raised, it is too elementary to require the citation of authorities that the State cannot now raise questions which it might have raised in that case. That case established unequivocally the existence and validity of defendant's charter, and that it was a continuation of the same company, under the same charter, that existed before the execution, and the foreclosure of the mortgages which it gave pursuant to law. When a party attacks the validity of a contract in a suit, he must in that suit show and maintain all the objections as to its validity. He cannot split up his cause of action. *Harrington* v. *Huff*

*& Mitchell Co.*, 155 Mich. 139 (118 N. W. 924). We there said:

"It would be a reproach to the law to permit the defendant to rely in one suit for the rent upon the claim that the tenancy had been changed by agreement from a yearly rental into one from month to month, and in a suit upon the next month's rent to interpose another defense, that of surrender and release, and, when sued for a third month's rent, to interpose, perhaps, the defense of a violation of the contract on the part of the lessor."

In order that there may be no misunderstanding as to the effect of the *Joy Case* and the issue involved, we quote from the opinion of Chief Justice Cooley, which was concurred in by the other Justices:

"The act of 1855 [Act No. 140, Laws 1855] was not promoted exclusively in the interest of the railroad companies named in it, but the State itself was largely concerned, and expected to accomplish important public purposes by means of it. Twenty years before that time the State had planned for the construction of several parallel lines of railroad across the State from east to west, one of which was to be north of the line of the Michigan Central Railroad, and was expected to be of very high value, not only to all that part of the State through which it would run, but to the whole State. Much disappointment had come from the road not being constructed; and, when the Detroit & Pontiac Railroad Company, which already had near 30 miles of road in successful operation, and could command means for the construction of more, proposed, on certain terms which were expressed in the act of 1855, to purchase the rights and franchises of the Oakland & Ottawa Company, and to extend their own road to Lake Michigan, there is no reason for doubting that the people of the State at large looked upon this as a favorable opportunity for accomplishing a desire which 20 years before had found expression in the legislation of the State, and which ever since had been kept constantly in view. * * *

"It has already been seen that the important public purpose which the State had in view in assenting to the act of 1855 has been accomplished. The railroad from Pontiac to Lake Michigan has been constructed, and for many years operated, and the State has reaped the bene-

fits. But in order to accomplish this public purpose it seems to have become necessary to put the bonds and shares of the Detroit & Milwaukee Railway Company upon the market as well in Europe as in this country. The State recognized the necessity, and by its legislation provided for facilitating sales. The bonds and shares were sold to the amount of very many millions, and every purchaser of one of them made the purchase in reliance upon legislation of this State which appeared to sanction if not to invite it.  *  *  *

" But another objection is made to the act of 1855, which goes to its substance. The act, it is said, is in conflict with that provision of the Constitution which declares that the legislature shall pass no act renewing or extending a special act of incorporation. Article 15, § 8. The act of 1855, it is said, undertook to do this; and, as the legislature could not do it originally, neither could it afterwards confirm and validate the void attempt. We think the relator misconceives the act. It does not purport or attempt to renew or extend any special act of incorporation. The general purpose is to enable the Detroit & Pontiac Railroad Company to take a new name, and under such new name to extend its road from Pontiac to Lake Michigan. There was nothing in this opposed to the Constitution, either in letter or spirit. And this answers a further objection, that the act of 1855 created a new corporation in violation of article 15, § 1, of the Constitution. We do not so understand it.

" It is further contended that an act approved February 10, 1859 [Act No. 96, Laws 1859], under which the railroad company is supposed to have been reorganized after the sales on foreclosure, was without validity for that purpose for the two reasons: *First*, that it was without validity when passed; and, *second*, that it has since, by implication, been repealed. The act is entitled ' An act in relation to mortgages against preferred stock in, and the delivery of goods by, railway companies.' Here it is said are two or more objects expressed, and therefore the act is invalid under the Constitution. Article 4, § 20. This is a somewhat technical objection, and we are not disposed to consider it after this great lapse of time. But it may be proper to remark that the act did not bring together subjects totally foreign to each other. The whole act concerned railways; and, if it can be considered a technical disregard of the Constitution, it was

probably inadvertent. The repeal of the act is supposed to have been accomplished either by the amendment of the general railroad law by an act passed in 1872 (Act No. 53, Laws 1872), or by the general revision of that law in 1873 (Act No. 198, Laws 1873), both of which covered the same general subject. But we do not agree in this. Those acts must be understood to refer to companies organized under the general railroad law, while the act of 1859 evidently had other companies in view. It speaks of railway companies—a term not made use of in the general law, but which the company succeeding the Detroit & Pontiac had taken as a part of its new name. It is suggested, rather than urged, that the legislature had no constitutional power to pass the act of February 10, 1859, as applicable to chartered corporations, because the effect was to create new corporations with the old chartered powers. But the purpose of the act was to permit the creditors of chartered corporations to enforce their demands by a sale and transfer of the franchises; and this would be impossible if the sale were of itself to operate as a destruction of the franchises. The act merely gave a remedy for the enforcement of debts; and, as franchises were to be sold for the satisfaction of debts, it provided a method whereby they might be kept alive.

"We have now considered the questions raised, so far as seems necessary to a determination of the main question whether the defendants are guilty of the usurpation charged upon them, and are clearly of the opinion that they are not. It may be proper to refer to the case of *Cook* v. *Railway Co.*, 43 Mich. 349 (5 N. W. 390), in which the validity of that corporation was indirectly recognized, though importance is not attached to it except as a part of the public history of the company."

The parties in this case are the same as they were in that. On the one side, in both suits, is the State, attacking the validity of the respondent's charter; on the other side, in both suits, is the railroad company, maintaining its special charter. The subject-matter of both suits is the same. The issue is the same. There were no two issues in the former suit, one of which the court decided, and one of which it did not.

This court said, speaking through the same learned Justice as in the *Joy Case:*

"Legal controversies are not to be suffered to be tried over and over, to the annoyance of parties, the disturbance of the community, the unnecessary absorption of the time of the court, and at an expense not less to the public than to the litigants. The general principles which must govern the case are familiar. There are two matters in respect to which an adjudication once made may be conclusive: *First*, the subject-matter involved in the litigation; *second*, the point of fact or of law, or of both, which was necessarily adjudicated in determining the issue upon the subject-matter in litigation. The subject-matter involved in a litigation is the right which one party claims as against the other, and demands the judgment of the court upon, as, for example, the right in ejectment to have possession of the lands; in assumpsit to recover a demand; in equity to have a mortgage foreclosed for an amount claimed to be due upon it, or to have specific performance of a contract, and so on. As respects this, if an adjudication is once had, and any question respecting it arises afterwards in a collateral suit, the adjudication will be held conclusive. It will also be conclusive in any new suit in which either party by his pleadings endeavors to put in issue and thus retry the subject-matter of the former adjudication, or any portion thereof." *Jacobson* v. *Miller*, 41 Mich. 90 (1 N. W. 1013).

Again, this court said in *Hall* v. *City of Kalamazoo*, 141 Mich. 503 (104 N. W. 689):

"It is no uncommon practice for courts, where several points are raised for determination, to affirm the case upon one point, and to say that, as to the other points, the decision of the court below was correct. All such questions, whether of fact or law, are then *res adjudicata*, and in another suit, brought for the same cause of action, it is of no importance whether the conclusions, either of fact or law, are right or wrong."

Many other cases from this court cited in the briefs of counsel are to the same effect. The rule is tersely stated by the United States Supreme Court:

"The very essence of judicial power is that, when a matter is once ascertained and determined, it is forever concluded when it arises again under the same circumstances and conditions between parties or their privies."

*New Orleans* v. *Citizens' Bank*, 167 U. S. 371 (17 Sup. Ct. 905).

So, where the controversy was over the force or effect of law as a contract and it was held to constitute a contract, the decision foreclosed the right to collect any taxes thereunder in the future. *Deposit Bank* v. *Frankfort*, 191 U. S. 499 (24 Sup. Ct. 154).

"The general rule of the extent of the bar is not only what was pleaded or litigated, but what could have been pleaded or litigated." *Northern Pacific R. Co.* v. *Slaght*, 205 U. S. 122 (27 Sup. Ct. 442).

A case very similar to this is *United States* v. *Land Co.*, 192 U. S. 355 (24 Sup. Ct. 266), wherein a second suit was brought to establish the title of the United States to certain lands, alleging a new ground not raised in the first suit for the same purpose. The court, in deciding the case, said:

"The best that can be said, apart from the act just quoted, to distinguish the two suits, is that now the United States puts forward a new ground for its prayer. Formerly it sought to avoid the patents by way of forfeiture. Now it seeks the same conclusion by a different means; that is to say, by evidence that the lands originally were excepted from the grant. But in this, as in the former suit, it seeks to establish its own title to the fee."

And further:

"But the whole tendency of our decisions is to require a plaintiff to try his whole cause of action and his whole case at one time. He cannot even split up his claim [citing cases]; and, *a fortiori*, he cannot divide the grounds of recovery."

An examination of the plea to the information in the *Joy Case* discloses that the respondent set up all the acts of the legislature upon which it relied, all its mortgages and foreclosure proceedings, and the declarations of the purchasers thereunder made and filed for the purpose of securing a continuation of the charter rights of the

company. After setting forth at great length this history of the corporation, the plea alleges that respondents, having become the purchasers,

"Were desirous of continuing to perform the duties and enjoying the franchises and immunities of said railway corporation, and in accordance with the provisions of the statutes of the State of Michigan applicable to said corporation; and they did state in said declaration under oath that they had provided the means for continuing the same, and for performing said duties and enjoying said franchises and immunities, that they had provided suitable equipments for running and operating said road, and for performing in all respects the duties to the public by law incumbent upon such corporation."

A long demurrer was interposed to this plea, assigning 31 grounds of demurrer, attacking the allegations of the plea, and the constitutionality of the various acts of the legislature affecting the respondent's corporate existence. A stipulation of facts was made to be used upon the hearing, and consisting of 34 paragraphs, admitting the facts set up in the plea, and also certain other facts shown by the proceedings of the legislature in passing the act of 1855. The purpose of that stipulation evidently was to place the entire controversy as to the validity of the defendant's charter before the court, and to obtain a decision which should be final. A decision was rendered which stood unchallenged for 20 years. It is pertinent here to inquire the purpose the State had in view in instituting and prosecuting that suit. The State had no intention or desire to destroy the railroad corporation. It had become a great artery of commerce, and its destruction would have resulted in incalculable injury, both to the stockholders of the company and to the people of the State. The State had recognized its existence under some State authority, and had received taxes from it for more than 30 years. The sole purpose of the suit clearly was to destroy the immunity of the corporation from liability for taxes other than that provided in its contract with the State by a judicial determination which would compel a

reorganization under the general railroad law. It had no other immunity of value. No other purpose is conceivable or is suggested in either of the suits. That purpose further appears from the brief filed in behalf of the State, in which it was said:

"This claim of respondents to special charter rights to avoid general law taxation leaves annually a large amount of specific taxes for the people to pay, which the alleged corporation ought to pay. The published reports of State officers leave no doubt as to the damage to the people. A certified statement from the railroad commissioner's office is hereto annexed, marked 'A,' and is relevant to show the interest of the State in the proceedings now here."

We therefore hold the *Joy Case* is conclusive of the validity of the defendant's special charter and its rights thereunder. The Federal courts so held in *Detroit, etc., R. Co.* v. *Powers, supra*. If the State considered that decision erroneous, or if it subsequently believed that it had other grounds for attacking its validity, or discovered other evidence which it considered material, its sole remedy was by an application for a rehearing. It cannot now be heard 20 years afterwards to attack the soundness of that decision. To hold otherwise would be an abrogation of the wise rule of *res judicata*. It would unsettle the rights of parties after their rights have been determined and settled by a judicial decision, and they have for many years acted and incurred obligations based upon it.

Effect of the decision of the Federal court. After the attempted repeal of respondent's special charter by Act No. 5, Laws Ex. Sess. 1900, and the passage of Act No. 173, Pub. Acts 1901, placing all railroads upon the same basis of taxation, the auditor general, as required by the law, levied taxes upon the respondent under these acts. He threatened a levy upon the property of the company to enforce payment. Thereupon the respondent brought suit in equity in the Federal court for the western district of Michigan, southern division. Respondent again set forth its existence under its special

charter, again insisted that the act of 1855 and its accept-
ance constituted a contract between it and the State, and
exempted it from taxation, except as therein provided, al-
leged the invalidity of the acts providing for its repeal
and taxation under the general law, and prayed for a
permanent injunction against the auditor general to re-
strain the collection of the taxes. The answer traversed the
allegations in the bill fully, asserting the invalidity of the
respondent's charter and the validity of the acts providing
for its repeal and taxation under the general law. Judge
Wanty held that "the whole matter has been disposed of
by the Supreme Court of Michigan in the case of *Attor-
ney General* v. *Joy*." The same arguments were made
there that were made in the *Joy Case*. Of them the
learned judge said:

"The reasoning contained in the brief of the defendant
and the numerous cases cited might have been very con-
vincing before the judgment in the case of *Attorney Gen-
eral* v. *Joy* was rendered, but whatever conclusion we
might have come to, if we were allowed to exercise an
independent judgment, is forestalled by that decision."

Not content with that decision, the State through its
proper officers, the auditor general and the attorney gen-
eral, took an appeal to the Supreme Court of the United
States. The decision of Judge Wanty was affirmed (201
U. S. 543, 26 Sup. Ct. 556); the court at the outset of its
opinion saying:

"Many questions which might otherwise be perplexing
are settled by the decision of the Supreme Court of Mich-
igan."

The same attacks were again made upon the respond-
ent's charter in that court that were made in the *Joy
Case*. After stating what that case decided, the court
proceeded to determine whether the act of 1901 did, as to
the respondent, impair the obligation of a contract. Upon
that point the court say:

"Surely no clearer case of contract can be presented

than one in which the legislature passes an act in respect to a particular corporation making special provision concerning taxation, and does so with a view of inducing large expenditures by the corporation and the completion of an unfinished road, whose completion is deemed of great public importance, and where the special provision is, as required, formally accepted, the expenditures made and the road completed."

That case was decided in October, 1905. Again the State ignored the decision of that court, and proceeded to levy taxes under the act of 1901, and in these cases is again attempting to enforce the collection of the tax, and again attacks the validity of respondent's charter, once settled in the *Joy Case,* and again in the *Powers Case.* The same questions and arguments are now presented without even a new dress to conceal their identity.

It is, however, insisted that the State was not a party to that suit, and that neither the attorney general nor the auditor general was clothed with power to represent the State in the suit so as to bind it. The taxes under Act No. 173, Pub. Acts 1901, were made "a debt due from each of said companies *to the State.*" Section 13. By the same section the only means provided for collecting the tax, if payment is refused, is a *command* to the auditor general by *warrant* to levy the same by distress and sale, or to bring an action in the name of the people of the State of Michigan in any court of competent jurisdiction for the enforcement of the lien, etc. Section 105, 1 Comp. Laws, reads as follows:

" It shall be the duty of the attorney general, at the request of the governor, the secretary of State, the treasurer, or the auditor general, to prosecute and defend all suits relating to matters connected with their departments."

The State was the sole party interested in the suit. Powers as an individual had no interest in it. He was not, and could not have been, brought before the court as an individual. He was before it representing the State as its agent duly authorized by the express provision of the

statute. The same is true of the attorney general. The State, by these enactments, not only authorized these officers to appear and defend, but made it their duty to do so. No discretion was lodged in them. If either refused, mandamus would lie to compel him to act in behalf of the State. It seems to be a rule of common sense and sound reason that the principal is responsible for the acts of his agent whom he has not only expressly authorized, but has commanded, to act for him. The statute provided no other way for the State to get into court than through these two officers as agents of the State. Who appealed from the decision of the district court to the United States Supreme Court? Not the individual Powers. He had no personal interest in such appeal. He and the attorney general appealed for, and on behalf of, the State. The State was not content to rest the decision of the United States district court upon the theory that the State was not a party and was not bound by it, but took an appeal. After that decision the State became the moving party, and took the respondent to the United States Supreme Court to review that decision. It there stood in the position of plaintiff in error, asking the decision of the court of last resort upon the issues involved. After reaching that court, the attorney general of the State applied to have the case advanced upon the docket for the reason that it was a State case, that the State alone was interested, and its revenues impaired. In the application by the attorney general "as Attorney General of Michigan, solicitor for appellant," to advance the case, he stated:

"That said cause is instituted in the circuit court of the United States for the western district of Michigan, is in effect a suit against the State, its duly authorized officers being enjoined from enforcing a certain revenue law of the State for the collection of taxes assessed against railroad corporations."

He also urged the special importance to the State of Michigan of an early decision of the questions at issue in the cause. Upon the representation that it was in fact a

State case, and that the revenues of the State were involved, the case was advanced. The statutes above cited constitute an express consent on the part of the State to appear and be represented in such suits by the officers named. In bringing suit under the statute and against the auditor general, the respondent brought suit against the State, and the attorney general, acting under the mandate of the law, appeared to defend the State in the suit, and not a party who had no interest in it. The statutes constitute a waiver of the rights of the State not to be sued without its consent. Furthermore, the acts and conduct of the State after suit was brought, as above stated, constitute a waiver of its immunity. The recent case (1905) of *Gunter* v. *Railroad Co.*, 200 U. S. 273 (26 Sup. Ct. 252), is decisive of this case. That case, like this, involved the revenue of the State. The language of the statute is very similar, but not as mandatory in character as that of our own. It reads:

"And, if the State be interested in the revenue in said action, the county auditor shall immediately upon its commencement inform the auditor of State of its commencement and of the alleged cause thereof, and the auditor of State shall submit the same to the attorney general, who shall defend said action for and on behalf of the State."

The facts and circumstances of that case are substantially the same as in this. The court held that the statute constituted a waiver of the State's immunity from suit. The county treasurer was made the tax collector, and was held to be the agent for the State, and in the suit represented the State. In a former decision (*Humphrey* v. *Pegues*, 16 Wall. [U. S.] 244) the court held that a contract existed between the State and the corporation, the assignor of the Atlantic Coast Line Railroad Company, by which it was exempt from taxation. The State of South Carolina attempted to raise the question again by a subsequent tax upon the corporation. The court held that the *Pegues Case* was *res judicata* not only of the taxes for the year involved in the *Pegues Case*, but of the right of taxation

for all subsequent years.    The assignments of error in the *Powers Case*, 19 in number, cover all the questions raised ·in the *Joy Case*.    The records and briefs in that case were before the United States Supreme Court.    The same questions were argued in both courts.    That court had jurisdiction to decide all the questions raised in the case.    One, and the first one to be decided, was the effect of the decision in the *Joy Case*.    That court held that it was *res judicata* of the validity of respondent's special charter.    This court will not review the decision of the United States Supreme Court upon that question any more than it will upon any other.    It is binding upon this court.

The decree of the circuit court in the tax case is affirmed, with costs of both courts, and the quo warranto case is dismissed out of this court, with costs.

MONTGOMERY, OSTRANDER, HOOKER, MOORE, MC-ALVAY, and BROOKE, JJ., concurred.