VAN BAALEN *v.* CITY OF DETROIT.

MUNICIPAL CORPORATIONS—AUTHORITY TO CONSTRUCT STREET RAIL-
WAY AND WIDEN PAVEMENT NOT A JUDICIAL QUESTION.

The conferring of authority to construct a street railway,
and to widen the pavement of such street because of
changed conditions, is a municipal rather than a judicial
question.

Appeal from Wayne; Dingeman (Harry J.), Web-
ster (Clyde I.), and Collingwood (Charles B.), JJ.
Submitted November 2, 1921.    (Docket No. 150.)
Decided December 22, 1921.

Bill by Marcus Van Baalen and others against the
city of Detroit and others to enjoin the construction
of a street railway, and the issuance of certain bonds.
From a decree dismissing the bill, plaintiffs appeal.
Affirmed.

*Donnelly, Hally, Lyster & Munro (John C. Donnelly,*
of counsel), for plaintiffs.

*Clarence E. Wilcox,* Corporation Counsel, for de-
fendants.

MOORE, J.    This case was heard before three chan-
cellors, who filed a written opinion which states the
issues involved so clearly that we quote from it as
follows:

"The bill of complaint herein is filed by six residents
of Eliot street, in the city of Detroit, residing between
John R. street and Brush street.    The bill as filed
has a double aspect.    In one aspect plaintiffs appeal
to the court as abutting property owners, and in the

other as taxpayers, asserting that their respective rights as such are being unlawfully interfered with.

"The relief asked is:

"(1) That the defendants be temporarily and permanently enjoined from enforcing or taking any steps to enforce the provisions of the ordinance adopted by the people on April 5, 1920, and from installing or attempting to install a double track railway system on Eliot street between Brush and John R. streets.

"(2) That the ordinance and the amendments to the charter which authorized it be declared invalid and void for any and all purposes.

"(3) That a temporary and permanent injunction be granted restraining the defendants from levying or attempting to levy any tax to pay the principal or interest of bonds issued to construct the municipal street railway system.

"(4) That a temporary and permanent injunction issue restraining defendants from levying any tax for the purpose of creating a sinking fund to pay the bonds at maturity.

"(5) That a temporary and permanent injunction issue to restrain defendants from issuing any of said bonds for the purpose of constructing said railway system as proposed by the ordinance adopted April 5, 1920.

"The supplemental bill asks the following additional relief:

"(5) That a temporary and permanent injunction issue restraining defendants from widening the pavement on Eliot street from St. Antoine street to Woodward avenue and from cutting down or otherwise injuring any of the trees growing in front of the premises of the plaintiffs on Eliot street.

"The questions presented involve the:

"(1) Validity of municipal street railway ownership proposition.

"(2) Validity of public utility bond provisions.

"(3) City's right to occupy Eliot street, between John R. and Brush streets.

"On January 6, 1920, there was introduced in the common council of the city of Detroit an ordinance providing for the acquisition, ownership, maintenance and operation of a municipal street railway system.

Particular routes or streets were prescribed on which it was proposed to construct either single or double tracks. Among the routes proposed was a double track system commencing on the western part of the city, at Buchanan and Junction avenues, and continuing easterly to the intersection of Charlevoix avenue and Alter road, a distance of approximately 12 miles, or 24 miles of single trackage. Included in this crosstown line were single track units at the corner of Woodward avenue and Eliot street and Woodward avenue and Rowena street. The former was to go easterly to John R. street and the latter from Woodward on Rowena to John R. street, then southerly to Eliot street, where the two tracks thence extended easterly on Eliot street to Riopelle street. The total mileage involved in the ordinance was approximately 218 miles of single trackage and provision was made for the issuance of $15,000,000 in public utility bonds for the purpose of acquiring and equipping this system.

"On January 13, 1920, the ordinance was referred to the street railway commission for consideration and recommendation, which body reported back the ordinance on January 20, 1920, recommending that the ordinance be adopted with certain minor changes.

"On January 27, 1920, the ordinance was adopted by the common council. Under the terms of the Constitution any proposition to acquire a public utility is required to receive the affirmative vote of 60 per cent. of the electors voting thereon and the ordinance accordingly contained the following proposition:

" 'Shall the city of Detroit be authorized and empowered to acquire, own, maintain and operate a street railway system upon the surface of the streets, avenues and public places of the city of Detroit and within a distance of ten miles from any portion of its corporate limits that the public convenience may require, for the purpose of supplying transportation to the city of Detroit and the inhabitants thereof, as hereinafter designated, to wit:

" '(Here follows description):

" 'and to borrow money on the credit of the city of Detroit by the issuance of the public utility bonds of the city of Detroit up to an amount not to exceed fifteen million ($15,000,000)

dollars for the purpose of so acquiring and owning said street railway system?

"'Yes ( ),
"'No ( )'

which, under the terms of the ordinance was to be submitted to the people of the city of Detroit on April 5, 1920. At this election the proposition carried by a vote of 88,585 for and 50,776 against it, or a majority of 63.6 per cent.

"On April 6, 1920, work commenced on the original unit of the cross-town line in question—Charlevoix avenue from Alter road to the Detroit terminal railroad. On June 8, 1920, bids were advertised for the balance of the cross-town line and a contract let on July 19, 1920, to John A. Mercier, one of the defendants, and work immediately started from Junction avenue easterly on Buchanan towards Woodward avenue and from the Detroit terminal westerly towards Woodward avenue. On February 1, 1921, the first unit of the line was completed and operations begun. The entire line has been excavated, tracks laid and at the present time the line is practically completed except for track intersections. The tracks provided for in the ordinance have been laid on Eliot street, from Woodward avenue to Riopelle street.

"Upon request of the street railway commission, public utility bonds authorized at the April 5th election, to the extent of $3,750,000 have been sold at public sale pursuant to section 9 of the street railway section of the charter of the city of Detroit, and these bonds have been purchased and held as follows:

"General public ...................... $3,580,100.00
Detroit Sinking Fund Com............ 76,000.00
Detroit City Treasurer.............. 93,900.00

"On April 10, 1920, the Detroit United Railway in its capacity as a taxpayer commenced a suit in the United States district court for the eastern district of Michigan, against the city of Detroit, the street railway commission *et al.*, praying for an injunction to restrain the defendants from taking any steps to enforce the proposition of April 5, 1920, or the issuance of the bonds authorized and asking said ordi-

nance and proposition of April 5, 1920, be declared invalid and void for any and all purposes.

"In this bill it is alleged as follows:

" 'That the plaintiff is a taxpayer in the city of Detroit, whose property therein assessed for and subject to taxation has an assessed value of upwards of $25,000,000. That the bonds proposed to be issued under the terms of said ordinance will be a legal liability of the city of Detroit, and as such payable out of the moneys raised by taxation upon the property in said city, including the said property of the plaintiff. That on the basis of the present assessed valuation of said city the property of said plaintiff will be liable for taxes to be raised for such purpose to an amount greatly in excess of $3,000.'

"The district court dismissed the bill and entered a decree upholding the validity of the election and proposition. From this decree the Detroit United Railway appealed to the United States Supreme Court which court on February 28, 1921, affirmed said decree.

"On April 10, 1920, the New York Trust Company as trustees of certain mortgage bonds also commenced a suit in the United States district court for the eastern district of Michigan, attacking the validity of the election and proposition, and a decree was entered dismissing said bill. From this decree the plaintiff appealed to the United States circuit court of appeals (sixth circuit), where following the above decision of the United States Supreme Court, a dismissal of appeal was filed.

"On May 12, 1920 the Detroit United Railway filed suit against the city of Detroit, seeking to have declared void the election of April 5, 1920, and to restrain the work provided under the contract for work on Charlevoix avenue and the sale of $100,000 of these public utility bonds to the city treasurer. The bill alleged:

" 'That the bonds of the city of Detroit, hereinafter referred to, issued and proposed to be issued for the purposes of acquisition by the city of Detroit of a municipal street railway system will be, if valid, a legal liability of the city of Detroit and as such payable out of moneys raised by taxation upon property in said city, including the plaintiff's property.'

"And further averring that said proposition gave no lawful authority to the city to acquire or construct said municipal system or any part thereof; that no such authority was derived from any source nor any lawful authority to issue any bonds for that purpose and that no money except the proceeds of public utility bonds or street railway bonds lawfully issued under the provisions of sections 9 and 10 of chapter 13, title IV of the Detroit city charter can lawfully be used by the city for such purposes.

"A decree dismissing the bill was entered by Judge Mandell reciting:

" '(1) That the vote on the municipal railway proposition held at the election of April 5, 1920, conveys lawful authority to the city of Detroit to acquire a municipal street railway system as provided in said proposition.

" '(2) That said election conveys lawful authority to the city of Detroit to issue the $15,000,000 public utility bonds voted thereon at said election on the credit of the city of Detroit.

" '(5) That the proceedings relative to the issuance and sale of said public utility bonds and of the provisions for a sinking fund therefor were properly taken.'

"This decree was affirmed by the Supreme Court on June 6, 1921 (214 Mich. 170).

"On August 2, 1920, the Detroit United Railway as a taxpayer commenced another suit against the city of Detroit and its officials, in which bill the same allegations are made and an injunction sought restraining the sale of some $1,450,000 of the bonds in question to the Detroit sinking fund commission, and asking to have declared void the ordinance and proposition of April 5, 1920, and to enjoin the execution of all contracts and purchases by the street railway commission and particularly the Mercier contract for the construction of the Buchanan-Charlevoix-Crosstown line in question here. This case was heard before Judge Henry A. Mandell, who caused a decree to be entered upholding the validity of the municipal ownership election and proposition and the right and authority of the city of Detroit to issue its public utility bonds in the sum of $15,000,000 on the credit of the city.

"On September 9, 1920, certain taxpayers who were

residents of Clairmont avenue between Woodward avenue and Linwood avenue, filed suit alleging that said street was a highly restricted residential street; that the street was 60 feet wide, with a 26 foot pavement, with a 17 foot boulevard on each side of the pavement and that the construction of a double track street railway with necessary equipment and the operation of cars thereon would not be a legitimate use of the street, because of the narrow pavement and street; that its use by the municipal street railway would be illegal and a deprivation of property without due process of law and in violation of the 14th Amendment of the Constitution of the United States and the Constitution of the State of Michigan. This case was heard before Judge Wm. B. Brown, sitting in the Wayne circuit court, and the following decree entered dismissing the bill of complaint:

"(1) That the vote on the municipal street railway proposition of April 5, 1920, conveyed lawful authority to the city of Detroit, a municipal corporation, to acquire, own, maintain and operate a municipal street railway system as provided in said proposition.

"(2) That said election of April 5, 1920, conveyed lawful authority to the city of Detroit to issue the $15,000,000 public utility bonds authorized at said election on the credit of the city of Detroit.

"(3) That the building of a street railway track upon a public street is not an added servitude of the street and is a proper and legal use of the street, other things being equal. * * * The construction on said street of street railway tracks is not in violation of any restrictive provision of any deeds to property fronting said Clairmont avenue.

"1. Validity of municipal street railway ownership proposition and validity of public utility bond provisions.

"Plaintiffs contend:

"(1) That the city of Detroit in framing its revised charter has made deductions from its gross debt beyond those which are permitted by the provisions of Act No. 279, Public Acts of 1909, as amended (home rule bill, so called).

"(2) That the amendment to the charter adopted on April 7, 1919, authorizing a bond issue of $3,000,000 for the Belle Isle

bridge, the amendment fixing the gross debt of Detroit at 4 per cent. and the amendment setting aside 2 per cent. for utility purposes increased in one single increase the borrowing power of the city in excess of the 2 per cent. permitted by section 4 of the home rule bill.

"(3) Street railway bonds are not full faith and credit bonds.

"The city interposes the objection that the plaintiffs as taxpayers are estopped from asserting these claims in this action because the validity of the election of April 5, 1920. The right of the city to issue its $15,000,000 of public utility bonds on the credit of the city and the legality of the creation of the sinking fund from taxation have all been upheld by decrees in taxpayer's suits. The precise questions presented by the instant case were not raised in the other proceedings upon which defendants rely as a bar; nor were the plaintiffs in this case parties by name to the other proceedings. The courts have decided however, with considerable unanimity that in public matters (in the absence of fraud or collusion) where proceedings are instituted by one taxpayer, in a matter of general interest to all its citizens, every taxpayer is a real, though not a nominal party to such judgment and is bound thereby. Likewise, it has been held that the extent of the bar is not only what was pleaded or litigated, but what could have been pleaded or litigated. *People* v. *Railway Co.*, 157 Mich. 147; *Northern Pac. R. Co.* v. *Slaght*, 205 U. S. 122 (27 Sup. Ct. 442) ; *Deposit Bank* v. *Frankfort*, 191 U. S. 499 (24 Sup. Ct. 154) ; *Sabin* v. *Sherman*, 28 Kan. 289; *Harmon* v. *Auditor of Public Accounts*, 123 Ill. 122 (13 N. E. 161) ; *Ashton* v. *City of Rochester*, 133 N. Y. 187 (30 N. E. 965, 31 N. E. 334) ; *Greenberg* v. *City of Chicago*, 256 Ill. 213 (99 N. E. 1039, 49 L. R. A. [N. S.] 108) ; 23 Cyc. p. 1269, and cases cited.

"The rights sought to be enforced by the plaintiffs in this case in their status as taxpayers and the rights of the plaintiffs in the other cases were public rights, applicable to all taxpayers in the city. We conclude, therefore, that the judgments in the other proceedings are a bar to such questions as are presented in the instant case in so far as concerns plaintiffs' rights or interests as members of the general public.

"City's right to occupy Eliot street between John R. and Brush streets.   In respect to rights which they hold as residents of Eliot street, peculiar to themselves and not shared with the public, plaintiffs contend:

"(1) That no appropriation has been made in 1920 or 1921 budgets for widening Eliot street.

"(2), That the cost of widening the pavement on Eliot street is not a proper charge against the public treasury, but must be charged against street railway construction.

"(3) That the procedure adopted for widening Eliot street (by resolution instead of by ordinance) is not in accordance with the requirements of the charter.

"1. In connection with the first contention of plaintiffs, that no appropriation has been made for widening Eliot street, a number of questions have been raised.   We have considered all of them.   The ordinance provides for the department of public works 'to resurface or repave said roadbeds where required and to pave the area of said roadbeds as widened,' and it is urged that the paving of that portion of the street representing the widening part is not resurfacing. The ordinance is broad enough to cover the paving of the area of the roadbeds as widened, and the appropriation covers generally repaving, resurfacing and paving.   There is no obligation on the part of the city to pave or repave this street after it is widened; it is entirely a matter of legislative discretion, and whether there is an appropriation or not is of no importance.   It was formerly the custom, in making up the annual appropriations, to specify in detail the use to which the money was to be put.   According to the testimony, the investigation and examination of the different streets submitted for repairing, became too laborious for the mayor and the mayor requested that hereafter no such detailed list be given to him, and this plan was adopted in 1920.   We see no legal objection to this plan.   The common council and the mayor, in approving the contracts and recommendations of the department of public works for the repaving or resurfacing of the different streets as they are submitted by that department, are called upon to exercise their judgment as to each expenditure. Whether these officials exercise their judgment with

or without a proper or complete knowledge of the conditions is not a judicial question.

"2. Can the cost of widening the pavement on Eliot street be paid out of the public treasury, or must it be charged to street railway construction? It may be taken as an established fact from the proof that the proposed widening of Eliot street is due solely to the presence of the street railway. Under the charter the common council has control of the streets. The question of whether the common council shall order a street pavement widened under the circumstances here presented is an administrative function to be decided according to its own discretion. In the absence of some charter provision to the contrary, the cost of such widening may be paid from taxation. Unless it can be said then that the charter provisions relating to the street railway commission require such cost to be paid as a part of the construction expense, the contention of plaintiff is not sound.

"Section 14, p. 69, of the charter provides among other things, as follows:

"'The rate of fare on said street railway system shall be sufficient to pay, and the said board shall cause to be paid:

"'(a) Operating and maintenance expenses including paving and watering between tracks.'

"Then follow other provisions which have no application to the question here presented.

"Section 4, p. 108, of the charter provides 'that no money shall be raised by taxes for any purpose without the consent of the council.' It follows that the council has the authority to pay for this widening by taxation, there being nothing in the charter requiring it to be paid for out of the revenues of the street railway system.

"3. It is next urged that the procedure adopted for widening Eliot street is a legislative matter and must be done by ordinance and not by resolution. Assuming such to be the case, it appears that an ordinance was adopted April 26, 1921, after the council had some months previously determined on the widening of the pavement by resolution. This ordinance was given immediate effect and would be effective now even though it lacked the immediate effect clause. While

this ordinance was adopted after these proceedings were instituted, we cannot see how anything more than the plaintiff's technical rights, if any, are prejudiced if the court considers this ordinance in the determination of the questions presented.

"We have carefully considered all of the questions presented, and while it may be a source of annoyance and inconvenience to the plaintiffs to have a street railway pass their homes, the procedure adopted by the city for the establishment thereof, in our opinion, is in accordance with the law applicable thereto."

From a decree dismissing the bill and supplemental bill of complaint, the case is brought here by appeal.

The plaintiffs ask this court, we quote from the brief:

"For a decree perpetually restraining the city of Detroit from:

"1. Widening the pavement on Eliot street because there is no fund out of which to pay that expense— no money having been appropriated for that purpose.

"2. Expending any public money for the purpose of further constructing a street railway on Eliot street, and from operating cars on Eliot street while the pavement is not widened, because the operation of the cars would deprive the plaintiffs of their property rights of ingress and egress.

"3. Issuing any bonds on its 'faith and credit' for said street railway, because by the amendment to its charter in 1919, it, in a single instant, increased its bonding limit to a sum greater than 2 per cent.

"4. Issuing any bonds on its 'faith and credit' because by its amendment in 1919 the city has provided for a deduction from its gross debt of items not permitted by the home rule act; and the provisions of the charter, by which sinking funds have been created for the payment of these items deducted, are exclusive; and that the items thus deducted are not debts upon the faith and credit of the city, but are debts resting solely against the sinking fund, which have been created for the payment of those issues of bonds.

"5. Attempting to create any sinking fund or the payment of these bonds except a sinking fund which

the charter provides shall be raised and created out of revenues of the street car system.

. "6. Expending any of the public money out of the public treasury, that has been raised by taxation, for the purpose of widening the pavement on Eliot street, because the widening confessedly, on the testimony introduced, is done for the purpose of enabling the municipal railway to be operated on said street."

. Many reasons are urged by counsel why the injunction should be granted.

An extension of time was granted for the oral argument. The case is excellently briefed. The case has been presented in a very exhaustive way. We shall not undertake to deal with the questions discussed in detail though they have had our very careful attention. Under the oral argument much time was taken in discussing whether the cases cited in the opinion of the chancellors, from which we have quoted, foreclosed the instant case upon the doctrine of *res adjudicata;* counsel for the city contending they did, while counsel for the plaintiffs insist the questions presented are still undecided. The briefs also devote a good deal of space to a discussion of the same question. For reasons which will appear later we think it unnecessary to decide the question of *res adjudicata.*

The case of *Detroit United Railway* v. *Wayne Circuit Judge,* 212 Mich. 230, the case of *Detroit United Railway* v. *City of Detroit,* 214 Mich. 170, and the case of *Detroit United Railway* v. *City of Detroit,* U. S. Adv. Ops, 1920-21, 356 (41 Sup. Ct. 285), each of them considered some phase of the questions involved in the case before us. While no one of them is controlling, we think the law as declared in the opinions in the last two cases, when applied to the facts in the case before us, is decisive of all questions except one, which will be considered later. These cases are so recent and so accessible that we shall content our-

selves with referring to them instead of quoting from them.

The remaining question is, Were the chancellors right in holding in effect that conferring the authority to construct a street railway line in Eliot street, and to widen the pavement because of changed conditions, was a municipal question and not a question for the courts? We think under the facts disclosed by this record the answer must be in the affirmative. See *Mannel* v. *Railway*, 139 Mich. 106; *Falls* v. *Railway Co.*, 189 Mich. 644.

The possibility of being obliged to submit to the construction of a street railway in front of one's residence is one of the penalties of living in a growing city.

The decree of the court below is affirmed, with costs to the defendants.

STEERE, C. J., and WIEST, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.