ATTORNEY GENERAL v. JAMES F. JOY, ELIJAH W. MED-
DAUGH, AARON B. MAYNARD, JOSEPH HICKSON, EDWARD
P. HANAFORD, WILLIAM J. SPICER, CHARLES STIFF,
JOSEPH HOBSON, SAMUEL R. CALLAWAY, JOHN
W. MCCLURE, FRANCIS B. GREY, SAMUEL
LAING, THOMAS W. POWELL AND
FRANCIS PAVY.

*Constitutional law—Grant, amendment, renewal and extension of corporate charters—Titles of statutes—Judicial notice—Confirmation of legislative acts, etc.*

1. A bill that has not been passed according to the conditions prescribed by the Constitution does not become a law by receiving the Governor's signature and by publication among the statutes.

2. A corporate charter cannot be amended in Michigan except by a two-thirds vote of the Legislature (Const. art. xv. § 8). An act purporting to amend a railway charter was recognized for nearly twenty years as valid, and the Legislature repeatedly based other laws upon it. It was then noticed that the vote on its passage, as recorded in the *Legislative Journal,* lacked one of the required number. *Held,* that the Legislature as well as the courts must take notice of what appears in the *Journal;* and that its subsequent adoption of acts in recognition of the amendment was a sufficient confirmation of that act to cure its original invalidity if any existed.

3. The honor and dignity of the State are under the protection of the courts as well as of the executive and legislative branches; and in matters of discretion the courts must protect it, even as against those departments.

4. An act of legislation may be confirmed by the subsequent recognition of it; an express confirmation is unnecessary.

5. An act enabling a railway company to take a new name and to extend its road is not an act renewing or extending its charter or creating a new corporation.

6. Titles to statutes must embrace only one object. Const. art. iv. § 20. *Held,* that the title "An act in relation to mortgages against preferred stock in, and the delivery of goods by, railway companies," is not clearly in violation of this requirement, as the whole act concerns railways.

7. Act 96 of 1859 relating to *railway* companies was not repealed by the implied amendment of the General Railroad Law in Act 53 of 1872, or by its revision (Act 198 of 1873) which acts refer to companies organized under the General Railroad Law.

8. An act permitting the creditors of a chartered corporation to enforce their demands by sale of its franchises is remedial only, and does not violate the constitutional prohibition against creating new corporations with the old charter powers.

Quo warranto proceeding. Submitted October 7. Decided October 15.

Attorney General *Jacob J. Van Riper* and *Edward Bacon* for informant. Void legislation does not become valid by any changes in the Constitution : *Dewar v. People* 40 Mich. 401 ; *Fenn v. Kinsey* 45 Mich. 450 ; the consolidation of two railway companies operating entirely in the same state dissolves the old companies and creates a new one ; *Mansfield, Coldwater & L. M. R. R. Co. v. Drinker* 30 Mich. 124 ; *Swartwout v. Mich. Air Line R. R. Co.* 24 Mich. 404 ; *Tuttle v. Mich. Air Line R. R. Co.* 35 Mich. 247 ; *Detroit, Lansing & Lake Mich. R. R. Co. v. Starnes* 38 Mich. 698 ; *Marquette, Houghton & Ontonagon R. R. Co. v. Langton* 32 Mich. 252 ; *Shields v. Ohio* 95 U. S. 319 ; *State v. Sherman* 22 Ohio 411 ; *State v. Maine Cent.* 66 Me. 488 ; *Hamilton M. Ins. Co. v. Hobart* 2 Gray 543 ; *Com. v. At. & Gr. West. Ry. Co.* 53 Penn. St. 9 ; *Shields v. State* 26 Ohio St. 86 ; *Railroad Co. v. Maine* 96 U. S. 499 ; *Railroad Co. v. Georgia* 98 U. S. 359 ; *McMahan v. Morrison* 16 Ind. 172 ; *Clearwater v. Meredith* 1 Wall. 40 ; *Lauman v. Leb. V. R. R. Co.* 30 Penn. St. 42.

*George Jerome, E. W. Meddaugh* and *Geo. V. N. Lothrop* for respondent. An act authorizing one railroad company to purchase the property and franchises of another does not form a new company : *Central R. R. v. Georgia* 92 U. S. 665 ; and see *Wallace v. Loomis* 97 U. S. 154 ; an invalid statute may be confirmed by its subsequent recognition in other statutes : *People v. Farnham* 35 Ill. 563 ; *Mitchell v. Deeds* 49 Ill. 419 ; *Bishop v. Brainerd* 28 Conn. 289 ; *Mead v. N. Y., H. & N. R. R. Co.* 45 Conn. 199 ; *Kanawha Coal Co. v. Kanawha & Ohio C. Co.* 7 Blatch. 394 ; *Swartwout v. Mich. Air Line R. R.* 24 Mich. 396 ; *People v. Maynard* 15 Mich. 463 ; *People v. Oakland County Bank* 1 Doug. (Mich.) 282 ; *People v. Manhattan Co.* 9 Wend. 381 ; *State*

*v. M. O. & Red R. R. Co.* 20 Ark. 495 ; the constitutional provision that a charter shall not be renewed or extended refers to the time or term of its duration : *Moers v. Reading* 21 Penn. St. 188 ; a state may by its own action forfeit or waive a right : *Society. &c. v. Pawlet* 4 Pet. 480 ; *White v. Ross* 15 Abb. Pr. 66 ; *State v. Turnpike* 15 N. H. 162 ; *Basshor v. Dressel* 34 Md. 503 ; *Black River R. R. v. Barnard* 31 Barb. 258 ; *Com. v. Andre* 3 Pick. 224 ; *Enfield v. Permit* 5 N. H. 280 ; *Campbell v. Kenosha* 5 Wall. 194 ; *Foster v. Fitch* 36 Conn. 236 ; *In re N. Y. Elevated R. R. Co.* 70 N. Y. 327 ; *President v. M'Conaby* 16 S. & R. 140 ; *Syracuse Bank v. Davis* 16 Barb. 188 ; as to the constitutional requirement that the title of a statute shall state but one object, see *Cont. Imp. Co. v. Phelps* 47 Mich. 299 ; *People v. Hurlbut* 24 Mich. 44 ; *Conn. Mut. L. Ins. Co. v. State Treasurer* 31 Mich. 6 ; *Attorney General v. Bradley* 36 Mich. 447.

COOLEY, C. J. The information in this case charges the respondents with claiming and usurping the corporate right, liberty, privilege and franchise known and called " The Detroit, Grand Haven & Milwaukee Railway Company," claiming to be organized and incorporated under some act or acts of the territory of Michigan, or of the State of Michigan, without being in fact so organized and incorporated, and also the corporate franchises, liberties and privileges of keeping, maintaining and operating a railroad extending westward from Pontiac to Grand Haven, and that of levying and receiving tolls and fares from passengers transported on said railroad, and of levying and collecting freight charges for carrying freight in cars upon said railroad, and calls upon them to show by what right they claim to exercise and use such franchises and corporate rights.

The defendants have pleaded to the information, setting out in full the title on which they rely. The title relied upon is as follows :

1. The charter of the Detroit & Pontiac Railroad Company for the building of a railroad from Detroit to Pontiac, which was granted by the territorial council of the territory of Michigan, March 7, 1834, under which a railroad company

was organized, which completed and put in operation a railroad between the towns named by October 1, 1844.

2. The charter of the Oakland & Ottawa Railroad Company, granted April 3, 1848, for the construction of a railroad from Pontiac by way of Fentonville to Lake Michigan; under which a railroad company was organized, the line of the road located and construction begun.

3. An Act of the Legislature approved February 13, 1855, whereby the name of the Detroit & Pontiac Railroad Company was changed to the Detroit & Milwaukee Railway Company, and the company, for the purpose of forming a continuous line, was authorized to purchase all the rights, property and franchises of the Oakland & Ottawa Railroad Company. The purchase is alleged to have been made, and thereby the Detroit & Milwaukee Railway Company became authorized to own, possess, build and maintain a continuous line of railroad from Detroit through Pontiac, and by way of Fentonville to Lake Michigan, and did, under the name last aforesaid, publicly use and exercise said corporate rights, privileges and franchises, and did proceed to complete the building and equipment of such railroad, and did on November 22, 1858, complete, equip and put in operation said railroad, so as to form a continuous line of railroad from Detroit through Pontiac by way of Fentonville to Grand Haven on Lake Michigan, and did thereafter continue to operate the same until it was sold on foreclosure as hereafter stated.

4. It is averred that the Legislature after said Act of 1855 did solemnly, by repeated acts of legislation duly passed by votes of more than two-thirds of all the members elected to each house thereof, recognize, confirm and ratify the said act, and did also recognize and confirm the said Detroit & Milwaukee Railway Company as a body corporate lawfully organized and existing under the provisions of said act. The subsequent acts are enumerated, and are the following:

(a) " An Act to authorize the Detroit & Milwaukee Railway Company to issue its shares in the kingdom of Great Britain," approved February 14, 1857.

(b) " An Act disposing of certain grants of land made to

the State of Michigan by Act of Congress approved June 3, 1856," approved February 14, 1857.

(c) "An Act to authorize directors of the Detroit and Milwaukee Railway Company to be represented at board of directors by proxy," approved February 3, 1858.

(d) "An Act to legalize certain loans made by the Detroit & Milwaukee Railway Company, and to permit further loans," approved January 29, 1859.

(e) "An Act to authorize the Detroit and Milwaukee Railway Company to purchase the property, rights and franchises of the Port Huron & Milwaukee Railway Company," approved January 29, 1859.

(f) "An Act to authorize the Detroit and Milwaukee Railroad Company to issue stock in place of the original stock of the Detroit and Milwaukee Railway Company," approved March 4, 1861.

The plea then avers the borrowing of money in 1855 and afterwards by the Detroit and Milwaukee Railway Company and the giving of mortgages to secure the loans, the foreclosure of certain of the mortgages and the sale of the railroad with its appurtenances on October 4, 1860, to Thomas Reynolds and William Gray, and the subsequent reorganization of the company by the purchasers under the name of "The Detroit & Milwaukee Railroad Company." Also a subsequent foreclosure, but of prior mortgages, under which, on September 4, 1878, the railroad with its appurtenances and franchises was again sold to Samuel Barker and others, who reorganized the same under the name of "The Detroit, Grand Haven & Milwaukee Railway Company," and that thereby the said Detroit, Grand Haven & Milwaukee Railway Company became a lawful corporation, possessed of all the franchises and privileges of said Detroit & Milwaukee Railroad Company, and authorized to own and maintain said railroad with its appurtenances, franchises and privileges, and that the respondents have been and are stockholders and directors thereof, and as such they lawfully claim and exercise the franchises in question.

Such is the title upon which the respondents rely. The Attorney General has demurred to the plea, and the case has been brought to a hearing upon the demurrer. The question is

whether the title set out in the plea is sufficient. The Attorney General contends that it is not, and points out certain particulars in which it is supposed to be defective.

I. It is said that the Act of February 13, 1855, through which the Detroit & Milwaukee Railway Company made claim to the franchises and privileges which had before that date pertained and belonged to the Detroit & Pontiac Railroad Company and to the Oakland & Ottawa Railroad Company, was never constitutionally passed, and therefore never became a law at all, but was a mere nullity. The Act was one purporting to amend or alter a corporate charter, and therefore, under the Constitution (Art. xv., § 8), required the assent of two-thirds of the members elected to each house. Referring to the legislative journals, they seem to show that the affirmative vote in the lower house lacked one of the necessary two-thirds. Consequently, it is said, the Detroit & Pontiac Railroad Company never acquired the franchises of the Oakland & Ottawa Railroad Company, and the Detroit & Milwaukee Railway Company was never legally organized. This is a somewhat startling proposition, in view of the vast interests that may be affected by its being sustained, and we have listened with great interest to the views which have been presented in its support. And it must be conceded that if we look no further than the act now under consideration, the prima facie case is with the Attorney General. A bill considered in the Legislature, but not constitutionally passed, can never become a law by its being signed by the Governor and published with the statutes. That is too plain a proposition to need argument or illustration.

But it is a surprising fact, if the vote was insufficient, that the question of invalidity was not sooner raised. Nothing was better understood at the date of the act in question than the requirement of the Constitution in respect to the amendment of corporate charters: the subject had been largely discussed when the Constitution was before the people for adoption five years before, and the provision on the subject was re-

garded as of great importance. There was a considerable
vote in opposition to the act in question, and if the vote in
its favor was insufficient, it seems strange that attention was
not challenged to the fact immediately. It is customary in
this State to publish the daily journals of the Legislature in
full, and to place printed copies on the desks of members on
the morning of the day succeeding the one whose proceed-
ings they give; and it seems incredible that if a mistake was
made in declaring a bill passed which had not received the
necessary vote, the mistake should not have been discovered
as early as the day following. When the circumstances and
the legislative custom are taken into consideration, there
is much ground for the suggestion which is made on the part
of respondents, that a mistake occurred in the making up or
printing of the journal, and that the mistake probably con-
sisted in the omission of one or more names in giving the
final vote. And plausibility is given to the suggestion by
the fact that twelve members of the house are not recorded
as having voted at all when the bill was put upon its passage.
But we cannot now judicially determine that there was any
such mistake: the legislative journals furnish no proof of it,
and it remains merely a plausible conjecture. We direct our
attention, therefore, to the facts occurring since, and which
are relied upon as giving validity to the Act of 1855 even
though it may not have been constitutionally adopted.

The subsequent facts to be considered embrace—*first*, the
acts of the stockholders in the several railroad companies and
of other persons done in reliance upon the Act of 1855; and
*second*, the acts of the State itself in recognition of that Act.
And *first*, of the acts of stockholders. It appears beyond
dispute or cavil that the stockholders in the Detroit & Pon-
tiac and the Oakland & Ottawa Railroad Companies accepted
the Act of 1855 and acted upon it as valid legislation; that
the one class bargained and paid for the rights and franchises
belonging to the other, and the other sold them; that the
Detroit & Milwaukee Railway Company contracted large
debts which could have had no validity if the corporation
was not lawfully organized; that it assumed to issue and sell

bonds, and to give mortgages for their security, and that it constructed, equipped and put in operation a railroad from Pontiac by way of Fentonville to Grand Haven, part of a continuous line from Detroit to Lake Michigan. It also appears that when the bonds of the company failed to be paid the mortgages were foreclosed, the road and its franchises were sold, as was supposed, and new companies successively organized by the purchasers to operate the road in reliance upon the franchises. The bonds issued amounted to many millions of dollars; they were sold in the money markets of this country and Europe, and bought in the belief that they were entirely valid; the shares of the company supposed to have succeeded to the franchises, rights and property of the Detroit & Pontiac Railroad Company were also, for more than a quarter of a century, dealt in as the shares of lawful corporations possessing the property, rights and franchises which they assumed to possess. These are unquestioned facts.

Next, as to the acts of the State. To understand and appreciate the full significance of these it is necessary to know that the Act of 1855 was not promoted exclusively in the interest of the railroad companies named in it, but the State itself was largely concerned, and expected to accomplish important public purposes by means of it. Twenty years before that time the State had planned for the construction of several parallel lines of railroad across the State from east to west, one of which was to be north of the line of the Michigan Central Railroad, and was expected to be of very high value, not only to all that part of the State through which it would run, but to the whole State. Much disappointment had come from the road not being constructed; and when the Detroit & Pontiac Railroad Company, which already had near thirty miles of road in successful operation, and could command means for the construction of more, proposed, on certain terms which were expressed in the Act of 1855, to purchase the rights and franchises of the Oakland & Ottawa Company and to extend their own road to Lake Michigan, there is no reason for doubting that the

people of the State at large looked upon this as a favorable opportunity for accomplishing a desire which twenty years. before had found expression in the legislation of the State, and which ever since had been kept constantly in view.

Keeping this in mind, we may be better able to understand the significance of subsequent legislation.

The first act thereafter passed which is of importance in this litigation, was a short Act, approved February 14, 1857, the purpose of which was to authorize the Detroit & Milwaukee Railway Company to establish an office for the transfer of its shares in London or elsewhere in the kingdom of Great Britain. Manifestly the intent was to facilitate the sale of the shares in the money markets of that country. No question is made of the legal adoption of this Act, but it was idle legislation if the Act of 1855 had no validity.

. The next Act to be mentioned was approved on the same day, and had for one of its objects to confer upon the Detroit & Milwaukee Railway Company a certain land grant to aid in the construction of a railroad from Owosso to Grand Haven, being part of the line which had been located by the Oakland & Ottawa Railroad Company, and transferred by that company to the Detroit & Milwaukee. This Act makes no reference to the Act of 1855, but it was plainly, so far as concerned this grant, supplemental to that Act, and could not have been more so had it referred to it in terms.

The Act of February 3, 1858, authorizing the directors of the Detroit & Milwaukee Railway Company to be represented at board meetings by proxy, is only significant as showing continuous recognition by the State of that company as a lawful corporation.

The Act to authorize the Detroit & Milwaukee Railway Company to purchase the property, rights and franchises of the Port Huron & Milwaukee, approved January 29, 1859, was passed in furtherance of the original purpose of the State that the parallel line of road, north of the Michigan Central, should have an eastern terminus different from that of the latter road. This Act was also plainly supplemental to that of 1855.

The Act to legalize loans made by the Detroit & Milwaukee Railway Company, which was also approved January 29, 1859, refers to bonds and mortgages issued by the company "in pursuance of its charter," and purported to give to it full power to borrow "such further sum or sums of money as may be necessary to carry out fully the objects and designs of the charter of, and other acts of the Legislature of the State of Michigan in relation to, the said Detroit & Milwaukee Railway Company." But what charter did the company have to which this Act could refer? The answer, and the only possible answer, is it had none whatever, except the old charter of the Detroit & Pontiac Railroad Company which became the Detroit & Milwaukee Railway Company by change of name under the permission of the Act of 1855. This was the understanding of the shareholders, and it was quite as certainly the understanding of the State.

We need not follow this subject further. No one pretends that any of the legislation subsequent to the Act of 1855 was adopted in disregard of constitutional forms. It is indeed suggested that the Legislature was probably ignorant, at the several times when the subsequent enactments were passed, of the defect in the first act; but no such suggestion is admissible. The foundation of the relator's whole case is that this Court must take judicial notice of the journals of the Legislature, and of the defect in legislative action which they show. But judicial knowledge is not exclusively for the courts; what the judiciary takes notice of, the Legislature takes notice of also; and the Legislature is just as conclusively presumed to know that a pretended statute was never passed as we are. The case is to be considered, therefore, upon the assumption that the Legislature knew in fact what the members were bound in law to know, and that they acted in what was done by them in that knowledge.

What is proposed now, in the name of the State, is that the supposed Act of 1855, which is now said to be no legislative act at all, though the Legislature has often and in the most solemn manner recognized it as valid, shall be rejected and declared null. This is proposed to be done, too, under

circumstances which would render the consequences appalling. Property to the amount of many millions of dollars, consisting of bonds and other evidences of supposed indebtedness and of supposed corporate shares, would be instantly annihilated, and tangible property to equal value would be left without lawful owner. Very likely many persons not before us to-day, except by indirect representation, might be reduced from supposed affluence to poverty by such a judgment.

If the Act of 1855 is annulled, nearly all of the subsequent legislation which has been referred to must fall with it. Much of that legislation was unquestionably adopted in due form and with competent power; but it would fall because it is in its nature supplementary, and is defective or meaningless except in connection with that in reference to which it was enacted. What is asked, therefore, in the name of the State, is not merely that the Act of 1855 should be annulled, but that several other acts should in effect be set aside also. And this may well raise the question whether it is consistent with the honor and dignity of the State that under the circumstances the questions which have been argued should be raised. It has already been seen that the important public purpose which the State had in view in assenting to the Act of 1855 has been accomplished; the railroad from Pontiac to Lake Michigan has been constructed and for many years operated, and the State has reaped the benefits. But in order to accomplish this public purpose it seems to have become necessary to put the bonds and shares of the Detroit & Milwaukee Railway Company upon the market as well in Europe as in this country: the State recognized the necessity, and by its legislation provided for facilitating sales. The bonds and shares were sold to the amount of very many millions; and every purchaser of one of them made the purchase in reliance upon legislation of this State which appeared to sanction if not to invite it. Concede that purchasers were bound to know that the Act of 1855 was a nullity, and it is immaterial to the consideration now suggested; for the subsequent acts recognized the corporation as a lawful body poli-

tic, the owner of a great railway and competent to contract debts and give mortgages; and it was these facts which concerned purchasers of bonds and shares, and upon which they relied in buying. For the State under such circumstances to take steps for the annihilation of all these shares and securities by legal decision would have all the appearance of bad faith and of public repudiation of solemn State engagements. The several acts of legislation were not indeed contracts; but when the State by valid legislation invites the public to make specified investments, it may well be said that its faith is pledged to do nothing on its part which shall have for its purpose to render the investments worthless.

It may be said and is said that there can be no estoppel against the State in respect to such questions; and this is undoubtedly true. It is further said that the questions the Court is called upon to decide are purely legal questions. But when the dignity and honor of the State are involved the Judiciary has them in charge quite as much as either of the other departments of the government: one department as much as another must see that they suffer no detriment at its hands, while it is acting as representative of sovereignty within its constitutional sphere of duty. If therefore the appeal to the Court is to any extent an appeal to the discretion of the Court, it becomes its plain duty to see that when it speaks for the State it shall speak the voice of justice and maintain unimpaired the public faith; and it must do this even though the legislative or the executive departments were demanding something different. But in this case we do not understand that any department of the government has demanded or desired anything different, or that the people or any part of them have any wish inconsistent with public faith and integrity. Questions of a legal nature have for some time been made in respect to some of the legislation which has been referred to, and the Attorney General has thought it wise to bring them to the attention of the Court for settlement. This was very proper, and does not seem to be complained of. At the same time it seems equally proper to the Court that the consequences of a par-

ticular solution, not only to the owners of shares and securities but to the State itself, should be presented, and that it should be shown that this might possibly be a case in which the argument ab inconvenienti should be conclusive.

But treating the questions as purely legal questions, unaffected by the considerations mentioned, we should still be of opinion that no case was made by the relator. If we concede that the Act `of 1855 was not constitutionally adopted, and that for that reason it was a nullity at the time, it will not follow that it has remained invalid to this time. What the Legislature failed at that time to adopt in due form, it had ample power to affirm and validate afterwards if it saw fit to do so. It might have been confirmed by an act of legislation expressly declaring the intent of the Legislature to that effect; but that would be only one method of confirmation. The indirect method, by recognizing and acting upon it as a valid law and inviting others to do so, might be equally effectual. The question of confirmation is not one of form but of the expression of legislative will; and when we find the will expressed in any form of words, direct or indirect, it is sufficient. But the legislative will that the Act of 1855 should stand and have the effect intended in passing it, has been manifested over and over again during a period of over a quarter of a century, and has not during all that time been in doubt. We must dismiss this branch of the case as requiring no further discussion or consideration at our hands.

II. But another objection is made to the Act of 1855 which goes to its substance. The Act, it is said, is in conflict with that provision of the Constitution which declares that the Legislature shall pass no act renewing or extending a special act of incorporation. Article xv, § 8. The Act of 1855, it is said, undertook to do this; and as the Legislature could not do it originally, neither could it afterwards confirm and validate the void attempt.

We think the relator misconceives the act. It does not purport or attempt to renew or extend any special act of incorporation. The general purpose is to enable the Detroit & Pontiac Railroad·Company to take a new name, and under

such new name to extend its road from Pontiac to Lake Michigan. There was nothing in this opposed to the Constitution either in letter or spirit. And this answers a further objection that the Act of 1855 created a new corporation in violation of article xv, § 1 of the Constitution. We do not so understand it.

III. It is further contended that an Act approved February 10, 1859, under which the railroad company is supposed to have been re-organized after the sales on foreclosure, was without validity for that purpose for the two reasons—*first*, that it was without validity when passed; and *second*, that it has since by implication been repealed.

The Act is entitled "An Act in relation to mortgages against preferred stock in, and the delivery of goods by, railway companies." Here it is said are two or more objects expressed, and therefore the act is invalid under the Constitution, art. iv, § 20. This is a somewhat technical objection, and we are not disposed to consider it after this great lapse of time. But it may be proper to remark that the Act did not bring together subjects totally foreign to each other. The whole Act concerned railways; and if it can be considered a technical disregard of the Constitution, it was probably inadvertent.

The repeal of the Act is supposed to have been accomplished either by the amendment of the General Railroad Law by an Act passed in 1872 (Sess. L., p. 83), or by the general revision of that law in 1873 (Pub. Acts, p. 496), both of which covered the same general subject. But we do not agree in this. Those acts must be understood to refer to companies organized under the General Railroad Law, while the Act of 1859 evidently had other companies in view. It speaks of railway companies—a term not made use of in the general law, but which the company succeeding the Detroit & Pontiac had taken as a part of its new name.

It is suggested rather than urged that the Legislature had no constitutional power to pass the Act of February 10, 1859, as applicable to chartered corporations, because the effect was to create new corporations with the old chartered powers. But the purpose of the act was to permit the creditors of

chartered corporations to enforce their demands by a sale and transfer of the franchises; and this would be impossible if the sale were of itself to operate as a destruction of the franchises. The Act merely gave a remedy for the enforcement of debts; and as franchises were to be sold for the satisfaction of debts, it provided a method whereby they might be kept alive.

We have now considered the questions raised, so far as seems necessary to a determination of the main·question whether the defendants are guilty of the usurpation charged upon them, and are clearly of opinion that they are not. It may be proper to refer to the case of *Cook v. Detroit, Grand Haven & Milwaukee Railway Co.* 43 Mich. 345, in which the validity of that corporation was indirectly recognized, though importance is not attached to it except as a part of the public history of the company.

The demurrer is overruled, and judgment must be entered for respondents.

The other Justices concurred.