GROESBECK *v.* GRAND TRUNK RAILWAY COMPANY OF CANADA.

1. RAILROADS—NEGLIGENCE—DEATH BY WRONGFUL ACT—CARS—EVIDENCE AS TO CONTROL.

Under testimony, in an action for personal injuries, that several railroad companies constituted a system that was operated as a unit, that one of the companies having shipped a freight car conveyed the same over its own line, and over another line upon which it had a right of way to the junction with one of the other companies of the system, and that the car was then taken over such road to the yards of the latter company, it was not established that the original carrier had relinquished control of the car.

2. MASTER AND SERVANT — RAILROADS — CONJECTURAL INJURY — NEGLIGENCE.

Evidence tending to show that the wooden ladder on the end of a freight car was split and would spring outward if it was pulled, that decedent climbed on the car to brake it and prevent it from drifting, that he gave a spring towards the brake and in some way fell, but that the ladder did not break with him, does not have a tendency to show that the condition of the ladder frightened decedent and caused him to leap from it to the brakes; the cause of his fall being conjectural, the court should have directed a verdict for defendant.

3. SAME—DECLARATION—INSPECTION.

Under a declaration containing no averment that defendant

failed to inspect the freight car, and under the statement of her attorney that failure to inspect was not relied upon, the point should not have been left to the jury.[1]

4. SAME—CONTRIBUTORY NEGLIGENCE.

The question of decedent's contributory negligence was for the jury.

Error to Shiawassee; Miner, J. Submitted June 26, 1911. (Docket No. 39.) Reargued October 12, 1911. Decided November 3, 1911.

Case by Emma Groesbeck against the Grand Trunk Railway Company of Canada and the Grand Trunk Western Railway Company and the Toledo & Muskegon Railway Company for the wrongful killing of plaintiff's decedent. Judgment for plaintiff. Defendants bring error. Reversed.

*Harrison Geer*, for appellants.

*Seth B. Terry* (*O'Dell Chapman*, of counsel), for appellee.

STONE, J. Emma Groesbeck, as administratrix, brought this action of trespass on the case, seeking to recover damages under the death act (3 Comp. Laws, § 10427), so called, for the killing of Alden B. Groesbeck, yard foreman, in the Detroit, Grand Haven & Milwaukee Railway Company's yards in Durand, at about 10 o'clock a. m. on the 18th day of May, 1907.

It will be noted that the Detroit, Grand Haven & Milwaukee Railway Company was not made a party defendant. The following excerpt from the declaration is here made:

"For that whereas, heretofore, to wit, on the 18th day of May, 1907, the above defendant the Grand Trunk Railway Company of Canada was and is a foreign corporation, but doing business in the State of Michigan, and was operating one or more of its lines of railroads in and through the county of Shiawassee, and the defendant the

[1] Duty of master to inspect tools or implements furnished servant, see note in 1 L. R. A. (N. S.) 944.

Grand Trunk Western Railway Company was and is a corporation organized and doing business under the laws of the State of Michigan, and operating its line of railroad in the county of Shiawassee, and the Toledo, Saginaw & Muskegon Railway Company was and is a corporation organized and doing business under the laws of the State of Michigan; all of said railroads being a part and parcel of one and the same system, known as the Grand Trunk Railway system; and all of which railways being so operated together and in conjunction with each other under the management and control of the Grand Trunk Railway Company of Canada.

"And on account of said railroads being so operated it became and was the duty of said defendants to furnish to any and all of their servants reasonably safe tools and appliances with which to work, and particularly to furnish to switchmen and brakemen cars whose ladders should be reasonably safe and sound for such employés to do the work required of them by said companies in switching and braking and making up trains, and it was their duty not to require any of their said employés to work upon cars in doing switching and braking that had defective ladders which would give way, or bolts draw out, and thereby cause them to lose their balance, or to slip on said ladders and fall and be injured. And it owed the further duty not to use cars with ladders where the boltings of said ladders to said cars were loose to such an extent that switchmen and brakemen in using them would believe that they were pulling out or off from said car, and cause said brakeman or switchman to believe that said ladders were dangerous and were giving way, and to believe that they were being put in danger of losing their lives, and on account thereof cause such switchmen or brakemen to endeavor to save himself by taking hazardous chances. * * *

"Yet, notwithstanding this fact, said defendants caused to be used in their yards in Durand, on the date aforesaid, a certain car, upon the end of which was a ladder that was defective, in that the sides of said ladder was split, and when an employé in the usual and ordinary course of his employment would take hold of the rounds of said ladder in the usual and ordinary way that said ladder would give way or spring from its fastenings to said car, and would cause one so using said ladder to believe that the same would give way entirely and was dangerous,

and would cause him to fall. And in doing the work of his employment, when the car was necessarily in motion, it would cause him to believe that he was in great danger of losing his life or receiving severe injuries to his person, and would cause him to take desperate chances to prevent such loss of life or serious injuries.

"And for that whereas, in the yards of said defendants at the village of Durand, Shiawassee county, at the time aforesaid, Alden B. Groesbeck was switching for said defendants in said defendants' yards at Durand, Mich. And, notwithstanding the duties aforesaid, said defendants were using said car with said defective ladder thereon above described, and it became and was the duty of said Alden B. Groesbeck to mount said car by the ladder aforesaid in the usual and ordinary course of his employment, and acting in the usual and ordinary way of doing his business as switchman he attempted to mount said ladder, and while so doing, on account of the defective condition of said ladder being split, loose, old, worn out, and rickety, it gave way, loosened, and sprung out from its fastening on said car, said car at the time being in motion, and on account thereof said Alden B. Groesbeck believed himself to be in great and imminent danger; and believing that unless he could save himself by attempting to secure a hold of the brake wheel, and getting a safe position on the sill along the end of said car, that he would be killed or receive great and serious injuries, he attempted to so save himself, and in so doing fell, and was run over by said car and instantly killed."

Upon the trial of the case, one George W. Alexander, a witness sworn on behalf of the plaintiff, testified in substance as follows:

"Direct Examination. By *Mr. Chapman:* I am secretary of all the companies composing the western division of the Grand Trunk system; the roads are the Grand Trunk Western Railway Company, the Detroit, Grand Haven & Milwaukee Railway, the Toledo, Saginaw & Mackinaw Railway, the Chicago, Detroit & Canada Grand Trunk Junction Railroad, and the Michigan Air Line Railway. All these roads are west of the Port Huron tunnel, and are in the western division of the Grand Trunk system. The roads east of the tunnel as far as Toronto are called the middle and southern division and the roads east of Toronto and extending to Portland,

Me., are the eastern division of the Grand Trunk system. These roads are operated in connection with each other under one president and one general manager. Charles M. Hays was general manager of the whole system on the 18th of May, 1907. A train starting from Muskegon over the Toledo, Saginaw & Mackinaw runs over its own line to Ashley, then over the Ann Arbor Railroad to Owosso, and the Detroit, Grand Haven & Milwaukee Railway to Durand; the latter road is a part of the Grand Trunk system. The Grand Trunk Railway Company of Canada extends east from the Port Huron tunnel to Portland, Me., and is a part of the Grand Trunk system, so called. I know that the Grand Trunk of Canada does not own or lease all of the roads in the Grand Trunk system. It leases some of them. The Grand Trunk of Canada leases the Cincinnati, Saginaw & Mackinaw Railroad, which extends from Bay City to Durand. I suppose the trains running over the Cincinnati, Saginaw & Mackinaw are made up at Durand. As treasurer, I understand that the expenses in keeping the yards in Durand are borne by the Detroit, Grand Haven & Milwaukee Railway. The Grand Trunk of Canada is lessee of the Cincinnati, Saginaw & Mackinaw and the Grand Trunk Western Railway. I should say that the Toledo, Saginaw & Mackinaw Railway would not be interested in any of the expenses at Durand. The money earned by the Toledo, Saginaw & Mackinaw is sent directly to the Old Detroit National Bank at Detroit, and is placed to the credit of the Grand Trunk Railway system. This is true also of the Grand Trunk Western Railway. After it has been deposited in the bank to the credit of the Grand Trunk system, Mr. Frank Scott, treasurer of the Grand Trunk Railway, has authority to draw it out. Checks to pay the men on those various railroads are drawn on a number of banks The roads that deposit in the Old Detroit National Bank, their men are paid from those funds deposited to the credit of the Grand Trunk system. Exhibit A is a time-table of the Western Division of the Grand Trunk Railway system. The roads mentioned there are in the system of the western division. All the roads on the time-table were not in the Grand Trunk system on the 18th of May, 1907; the Pontiac, Oxford & Northern was not.

"*Mr. Chapman:* Now we offer to read all the names of those roads that are in the system, except that one.

"*Mr. Terry* (reading): Grand Trunk Railway system, Western Division, Grand Trunk Western Railway, Detroit & Milwaukee Division, Detroit Division, Cincinnati, Saginaw & Mackinaw Division, Michigan Air Line, Toledo, Saginaw & Muskegon Division.  Should the Toledo, Saginaw & Muskegon haul freight from some point on its line bound for Battle Creek, the Toledo, Saginaw & Muskegon, the Detroit, Grand Haven & Milwaukee, and the Grand Trunk Western Railway would each get its mileage proportion of the through rate; that is, as to the number of miles each company hauled.

"*Q.* So if a car came down from Vickeryville upon the T., S. & M., billed for Liverpool, and it started at Vickeryville, I say, billed for this place, and came down from Vickeryville over the T., S. & M. at Ashley, and then running over the Ann Arbor road to Owosso, and then ran over the D. & M. down to Manhattan Junction, and I think there it would leave the Grand Trunk track—I mean Milwaukee Junction—it went, I think, to Milwaukee Junction, near Detroit, and there left the Grand Trunk line, that freight would be divided according to the distance the T., S. & M. hauled it and the other Grand Trunk lines hauled it, it would be divided between those roads, would it not?

"*A.* The Grand Trunk system's proportion of the through rate would be divided in this way.

"*Q.* The money derived therefrom would go to this bank and be deposited in one fund of the Grand Trunk system?

"*A.* Not unless the shipment was prepaid, and I don't suppose it was.

"*Q.* Not unless the freight was prepaid?

"*A.* Yes, sir.

"*Q.* No, the freight wasn't prepaid; the freight was paid at Manhattan Junction.

"*A.* That money wouldn't go in the bank at Detroit at all.

"*Q.* Where would that money come to?

"*A.* It would come to the company, a remittance from the southern company.

"*Q.* It would come to the company; what company do you mean?

"*A.* I don't know how this particular shipment traveled.

"*Q*. It traveled by way of the D., G. H. & M. down to Milwaukee Junction.

"*A*. If it was delivered to the Detroit & Toledo Shore Line at Detroit, they would pay the Grand Trunk the total charges up to Detroit.

"*Q*. They would pay the Grand Trunk system?

"*A*. Yes.

"*Q*. What would be done with the money, put in the bank?

"*A*. It all depends how it was paid. Yes; it would get into some bank.

"*Q*. Suppose it was paid, it would be paid to the D. & M. agent would it not, at Milwaukee Junction?

"*A*. Very likely.

"*Q*. Then what would he do with the money?

"*A*. Well, if the Detroit agent got it, it would go into the same bank in Detroit that we spoke about before.

"*Q*. No matter who got it, it would finally reach—

"*A*. Some bank.

"*Q*. It would finally reach the treasury of the system, would it not?

"*A*. Yes. There is a continuous line of railroad from Portland, Me., to Chicago. It is the Grand Trunk of Canada to the tunnel, then the St. Clair tunnel, and the Grand Trunk Western Railway to Chicago.

"*Q*. It comes right along through; there is no break in the trails, as you said?

"*A*. No.

"Cross-Examination. By *Mr. Geer:* Leaving Montreal, the railroad passes through the States of Vermont, New Hampshire, and Maine. I could not say whether they are separate corporations in each State. The Grand Trunk of Canada is a Canadian corporation. Its line terminates at Point Levis, opposite Quebec. You would not go to Quebec to reach Portland. You would go over part of the system.

"*Q*. What line of road do you go over?

"*A*. It is a part of the system; I don't know the names of the eastern—

"*Q*. You do know there is a road that goes through New Hampshire part of the way?

"*A*. Yes; the line runs through three States to go to Portland.

"*Q*. But the Grand Trunk of Canada is a corporation?

"*A*. Yes.

"*Q.* And it ends at Sarnia?

"*A.* Yes; Sarnia. Then the St. Clair tunnel has about two miles of track. The Grand Trunk Western Railway is a separate and distinct corporation, and has its separate officers. It runs between Port Huron and Chicago. They have a separate and distinct organization entirely; they pay their own taxes. The D., G. H. & M. has an entirely separate and distinct organization and also the T., S. & M. The Michigan Air Line is a separate company, and is under lease. The T., S. & M. Ry. runs between Muskegon and Ashley, and from Ashley it passes over the Ann Arbor railroad tracks to Owosso Junction, and from Owosso Junction runs over the D., G. H. & M. track to Durand. The T., S. & M. Ry. is a separate and distinct corporation. There is no such corporation as the Grand Trunk system. It is simply an advertising name for economical work. I have given the different corporations in Michigan which go to make up the system, so called.

" Redirect Examination. By *Mr. Chapman:* The lines of railroad in New Hampshire and Vermont, referred to by Mr. Geer, are included in the eastern division of the Grand Trunk system. I understand that the eastern division covers everything east of Toronto. It is a continuous line all the way through, and under one management. Mr. Hays is president of all the different companies, and all the roads are under his direction. He is president of the roads comprising the eastern division, the middle division, and the western division, and is general manager. Each of the companies comprising the western division has a separate organization, and he is president of them, and they are under his management. Mr. Egan is superintendent of these western roads, and is subject to the direction of Mr. Hays.

" Recross Examination. By *Mr. Geer:* Mr. Hays was not president of the Grand Trunk of Canada in 1907; he was second vice president and general manager. He was president of the Grand Trunk Western Railway and of all of the lines west of Port Huron.

" Redirect Examination.        By *Mr. Chapman:* Mr. Hays, in 1907, was president of the lines composing the western division of the Grand Trunk system, but he was not president of the Grand Trunk of Canada. He managed the western division, and the road was managed just as it is now, only there was one more man in the management.

"Recross Examination. By *Mr. Geer:* Mr. Hays was president of the western lines in 1907. There has been no change, so far as the western lines are concerned. Since this time, he has been elected president of the Grand Trunk of Canada.

"Redirect Examination. By *Mr. Chapman:* Mr. Hays was subject to the direction of the president in 1907, so far as the lines east of the river are concerned. He was president of the lines west of the river."

Upon the trial of the case, the plaintiff offered in evidence certain time slips used by plaintiff's decedent for the men who worked for him. The evidence tended to show it was his duty to keep their time. The following is a specimen of these time slips, as appears by Exhibit C:

"Grand Trunk Railway System. Form 161. Engine No. 1220. Fifth month, eleventh day, 1907. Fireman A. B. G. Switchman E. E. Smith, worked this day 10 hours. Got engine from roundhouse at 7 o'clock a. m., left engine at roundhouse at 6 o'clock p. m. [Signed] A. B. G., Signature of Foreman."

It appeared that the letters "A. B. G." stood for Alden B. Groesbeck. These time slips were upon printed forms, and the writing thereon was in the handwriting of plaintiff's decedent.

It further appeared upon the trial that one Charles E. Chittendon ordered, through the agent of the Toledo, Saginaw & Muskegon Railway Company at Vickeryville, on the morning of May 13, 1907, a box car to be loaded with barrel heading; the destination of said car being East Liverpool, Ohio. The agent ordered such car by telegraph from the master of transportation at Durand, and, on the 14th day of May, Pennsylvania box car No. 84,410 arrived at Vickeryville. The car was loaded on the 16th of May, and left Vickeryville at 12:50 p. m. on train No. 72, on the 17th day of May, 1907.

The Toledo, Saginaw & Muskegon Railway Company is one of the roads comprising the Grand Trunk system, but it is a separate and distinct organization. There is no such corporation as the Grand Trunk system. This is sim-

ply an advertising name for economical purposes. The railroad extends from Muskegon to Ashley, in this State; and from the latter point trains running over this road run over the Ann Arbor Railroad under a running agreement as far as Owosso Junction, and from that point over the Detroit, Grand Haven & Milwaukee Railway to Durand.

Upon the 17th day of May, the train from Muskegon, when it reached Vickeryville, took on the car in question. When this train reached Owosso Junction, it proceeded over the Detroit, Grand Haven & Milwaukee Railway to Durand, and the train was placed on one of the side tracks in the Detroit, Grand Haven & Milwaukee yards at Durand.

The main line of the Detroit, Grand Haven & Milwaukee Railway runs substantially east and west at Durand. To the south of this main line are six side tracks and a rip, or repair track. To the east of these sidings is a lead track, connecting with each siding or track.

On the day of the accident, plaintiff's decedent was yard foreman, and had been working in the Durand yards for about 17 years, having been a switchman, yardmaster, and for several years before his death foreman, which is the same as conductor; and he was in charge of the switching crew on the day in question. They started work in the Detroit, Grand Haven & Milwaukee yards that morning; and, after switching out some passenger coaches, went on the scale track to weigh some cars, among which was the car in question. The car in question was kicked up No. 1 switch track, which was the first track south of the main line of the Detroit, Grand Haven & Milwaukee Railway. This yard declines toward the east, and where the cars are not blocked, or brakes set, it frequently occurred that they would, when kicked in, run back and run afoul of the switch, or into some other car, and cause damage. Plaintiff's decedent having had this car kicked up No. 1 track did nothing about blocking it, or setting the brake. It was soon dis-

covered that this car was drifting back, and the attention of Mr. Groesbeck was called to the fact. He replied, "I'll get it." He ran over to the car, which was coming easterly, and when he met it got upon the east end, stepped upon the sill, and, while attempting to reach a horizontal brake wheel which was on the east end of this car, and is termed an auxiliary brake, between two and three feet from the ladder, he in some way lost his balance and fell off the car, and was killed. The ladder was on the east end of the car, and about 16 or 18 inches from the southeast corner of the car in its then position. It is claimed that this ladder was defective, and that in taking hold of it while on his way toward the brake wheel the ladder yielded to such an extent as to induce plaintiff's decedent to believe that it was unsafe, and in letting go thereof, and trying to reach the brake wheel, he slipped and fell and received the injury, causing instant death.

Upon the trial of the case the plaintiff had a verdict and judgment in the sum of $5,000. The defendants have removed the case here by writ of error. There are many assignments of error, some of which we do not deem it necessary to consider. Among defendants' requests to charge were the following:

"(2) I charge you that under the undisputed evidence in this case the Toledo, Saginaw & Muskegon Railway Company was not guilty of any negligence in the premises; and I further charge you that the Toledo, Saginaw & Muskegon Railway Company owed no duty to plaintiff's decedent, and you are therefore to return a verdict in favor of said defendant of no cause of action.

"(3) I charge you that the Grand Trunk Western Railway Company, one of the defendants in this case, has not been shown to have been guilty of negligence in the premises, and you will therefore return a verdict in its favor of no cause of action.

"(4) I charge you that under the undisputed evidence in this case plaintiff's decedent was killed while employed as yard foreman in the Durand yards of the Detroit, Grand Haven & Milwaukee Railway Company, which road is not a party defendant in this suit, and I further

charge you that none of the defendants can be made to respond in damages under the facts in this case for the death of plaintiff's decedent, which occurred in the yards of the Detroit, Grand Haven & Milwaukee Railway Company. Your verdict will therefore be no cause of action."

These requests were refused, and error is assigned thereon in the twenty-fourth, twenty-fifth, and twenty-sixth assignments of error.

1. This brings us at the threshold of the case to consider the question here raised by defendants' counsel by the requests above quoted. It is his contention that the defendants in this suit are not liable; that it appears by undisputed evidence that plaintiff's decedent was working in the yards of the Detroit, Grand Haven & Milwaukee Railway Company, which is not made a party in this suit; that the Grand Trunk Railway of Canada is a Canadian corporation, whose line of road extends as far west as Sarnia tunnel, Ontario; that the Grand Trunk Western Railway Company is a railroad corporation operating a railroad from Port Huron, in the State of Michigan, to Chicago, in the State of Illinois, and passes through Durand; that the Toledo, Saginaw & Muskegon Railway is a railroad which operates from Muskegon over its own line to Ashley; thence by running agreement over the Ann Arbor railroad tracks to Owosso Junction; and thence, also by agreement, as appears by the undisputed testimony, over the Detroit, Grand Haven & Milwaukee Railway tracks to Durand; that the defendants are separate and distinct railroad corporations, as appears from the undisputed testimony of George W. Alexander, secretary of both the Grand Trunk Western and Toledo, Saginaw & Muskegon Railway Companies, whose testimony we have here copied in full; that the Detroit, Grand Haven & Milwaukee Railway Company is no part of any of them; that it is a separate and distinct corporation, and pays its own taxes, and has its own entity, as has been held by numerous decisions of this court, and the Supreme Court of the

United States. Counsel have cited in support of this position the following cases: *Attorney General* v. *Joy*, 55 Mich. 94 (20 N. W. 806); *People* v. *Railway Co.*, 157 Mich. 144 (121 N. W. 814); *Detroit, etc., R. Co.* v. *Powers* (C. C.), 138 Fed. 264; *Powers* v. *Railway Co.*, 201 U. S. 543 (26 Sup. Ct. 556).

We cannot agree with defendants' contention that it appears from this record that the car in question had been turned over by the defendant the Toledo, Saginaw & Muskegon Railway Company to the Detroit, Grand Haven & Milwaukee Railway Company at the time of the injury complained of. For aught that appears, the car was yet under the control of the defendant the Toledo, Saginaw & Muskegon Railway Company, or at least was under the control of the associated roads, or system, of which the defendant the Toledo, Saginaw & Muskegon Railway Company was a member. This being so, we are of opinion that the circuit judge did not err in refusing to charge as above requested.

2. Upon the trial of the case, the two eyewitnesses to the accident testified in substance as follows: Howard Groesbeck, a son of decedent, who was 12 years of age at the time of the accident, testified:

"I saw the accident. I left home about 9 o'clock, and went down town on an errand. On my way back, I went up in the yards, where my father was switching. I stood there about 10 minutes, and was talking with him. In the meantime he kicked with the engine, and pushed a car up the track west of where we were standing. I don't know what the track number was. He later noticed the car was drifting back, and walked over and got on the stirrup, took hold of the ladder with his left hand, and then made a spring for the wheel, but missed it and fell. He made a spring and grabbed at the brake wheel as he fell; he was reaching, or made kind of a spring, toward the brake wheel with his right hand; he made a very quick spring. All I can say is he made a very quick effort, and sprang toward the brake wheel with all the vigor he had; that is what I saw. Then he fell. * * *

When my father made the leap with his hand stretched out, he fell to the ground inside the rail, and as the car was not coming very fast he rolled over the track and was caught on the north side of the track, and was killed. The car was in motion when he tried to mount it, when he made the spring, and when he fell; it passed over him and killed him. I could not see how close he came to making the brake wheel; I could not tell. His hand was stretched toward the brake wheel when he fell."

Edgar Smith, a witness called by the defendants, testified relative to the accident as follows:

"I called to him [Groesbeck], and said: 'That car is coming up there; you better get it.' And he answered, 'I'll get it,' and walked right across, probably within six feet of it, opposite No. 3 switch. He got on the end sill, walked right across, and that is the last I noticed of him until I saw him fall. He fell square on his feet, striking with his heels inside of the outside rail of the ladder on the north side of the wheel."

On cross-examination this witness testified:

"I saw him walk as far as the ladder, as far as the beam; then didn't see him until he fell off. I simply saw him reach and get the ladder, and then didn't pay any more attention to him. I didn't notice anything further than that he was making towards the ladder.   *   *   * I saw him when he dropped. I can't tell you what position he was in when he fell, or anything about it. He was on the north side of the wheel, and certainly passed the wheel entirely, because his heels were up against the rail on the north side of the car, and the ladder is on the south side of the running board. The car was going east."

Among the defendants' requests to charge, which were refused by the circuit judge, and which refusals are made the basis of the thirty-fourth and thirty-fifth assignments of error, are the following:

"(12) I charge you that the plaintiff has failed to show what caused her decedent to slip or fall from the sill of said car. I further charge you that to permit you to find

that, as decedent was in the act of passing over the sill on east end of said car, the ladder thereon pulled out, so as to cause him to lose his balance and fall to the ground, would be to permit you to base your verdict upon guess or conjecture.

" (13) I charge you that under the evidence in this case you would not be warranted in finding that the ladder on east end of said car in question caused or contributed to cause plaintiff's decedent to fall from the sill of said car, and your verdict will therefore be in favor of the defendants."

A careful reading of the entire record constrains us to say that the defendants were entitled to have the requests last above quoted given. There is no evidence that decedent became frightened because of the condition of the ladder. There is no evidence that any part of the ladder gave way, or in any manner yielded, as decedent was in the act of attempting to stop the car; and to permit the jury to find from the evidence that decedent's injury and death were in any way due to the condition of the ladder was to permit a verdict to be based upon conjecture and speculation. We are of the opinion that the cause of the fall from the car was purely conjectural. *Manning* v. *Railway Co.*, 105 Mich. 260 (63 N. W. 312); *Powers* v. *Railroad Co.*, 143 Mich. 379 (106 N. W. 1117); *Micari* v. *Stone Co.*, 154 Mich. 362 (117 N. W. 939). In our opinion, there was no evidence in the case that the condition of the ladder was either the proximate cause of the injury and death of decedent, or that such condition contributed to such injury or death.

As the case must be reversed for these reasons, it should also be stated that the charge of the court upon the subject of inspection was not warranted under the declaration, and in view of the repeated statement of plaintiff's counsel upon the trial that they did not claim any negligence on account of want of inspection.

We are of the opinion that the question of contributory negligence was for the jury.

167 MICH.—18.

For the errors pointed out, the judgment of the circuit court is reversed, and a new trial granted.

OSTRANDER, C. J., and BIRD, MOORE, MCALVAY, and STEERE, JJ., concurred. BROOKE and BLAIR, JJ., concurred in the result.